1

***CAZZELL & ASSOCIATES, ATTORNEYS***
***MARYANN CAZZELL, ESQ.*** (Bar #128780)
406 W. Fourth Street
Santa Ana, CA 92701
Telephone: 714/558-1772
Facsimile:  714/558-1883
*cazzell@msn.com*

*Attorneys for Plaintiff*
*A WHITE AND YELLOW CAB, INC.*

2

3

4

5

6

7

8

## *UNITED STATES DISTRICT COURT*

9

### *NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DISTRICT*

10

| | |
|---|---|
| A White and Yellow Cab, Inc., a California corporation, dba A TAXI CAB, dba 1-800-4 MY TAXI; | CASE NO.: |
| *Plaintiff,* | COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF |
| vs. | (VIOLATION OF THE UNFAIR COMPETITION LAW (*Cal. Busn. & Prof. Code* sections 17200 *et seq.*)); THE UNFAIR PRACTICES ACT (*Cal. Busn. & Prof. Code* sections 17000 *et seq.*)); THE LANHAM ACT (15 *U.S.C.* section 1125(a)); and FALSE ADVERTISING LAW (*Cal. Busn. & Prof. Code* sections 17500 *et seq.*)); FOR A DECLARATORY JUDGMENT UNDER 28 *U.S.C.* section 2201 INVALIDATING CPUC DECISION 13-09-045, as modified, AS VOID; AND FOR VIOLATION OF THE FEDERAL CIVIL RIGHTS ACT (42 *U.S.C.* sections 1983 *et seq.*)); |
| Uber Technologies, Inc.; Rasier, LLC; Rasier-CA, LLC.; the California Public Utilities Commission; Michael Picker, in his official capacity as Commissioner of the California Public Utilities Commission; Mike Florio, in his official capacity as Commissioner of the California Public Utilities Commission; Catherine J.K. Sandoval, in her official capacity as Commissioner of the California Public Utilities Commission; Carla J. Peterman, in her official capacity as Commissioner of the California Public Utilities Commission; and Liane M. Randolph, in her official capacity as Commissioner of the California Public Utilities Commission, | |
| *Defendants.* | *DEMAND FOR JURY TRIAL* |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

A. INTRODUCTION AND SUMMARY OF ACTION .......................................... 1

B. JURISDICTION AND VENUE ........................................................... 3

C. INTRADISTRICT ASSIGNMENT ...................................................... 3

D. THE PARTIES ........................................................................ 4

E. FACTUAL ALLEGATIONS .............................................................. 5

I. HISTORY OF LICENSING, PERMITTING, AND FRANCHISING OF
TAXICAB OPERATIONS IN THE COUNTY OF ORANGE, AND THE
FORMULATION OF OCTAP .............................................................. 5

   (i) Orange County's General Municipal Taxi Regulations ............................. 5

   (ii) Taxi Operations at Orange County's John Wayne Airport ........................ 5

   (iii) Taxi Operations in the City of Anaheim .................................... 5

   (iv) OCTAP .......................................................................... 7

      1) OCTAP Company, Driver, and Vehicle Permits ................................. 8

      2) OCTAP Insurance Requirements ............................................. 9

      3) OCTAP Drug and Alcohol Screening and Certification Requirements . 9

      4) OCTAP Taxicab Rates and Calibration/Certification by the
      Department of Weights and Measures ......................................... 9

      5) OCTAP Vehicle Safety Inspections ........................................ 10

      6) OCTAP's Limited Personnel and Working Hours ............................. 10

II. A TAXI'S HISTORY AS AN AUTHENTIC TAXICAB COMPANY, THE
PRIOR GROWTH OF ITS FLEET, ITS PRIOR AIRPORT FRANCHISE, AND
ITS CURRENT CITY OF ANAHEIM FRANCHISE ......................................... 10

III. TRADITIONAL ROLE OF THE CPUC IN TRANSPORTATION
LICENSING AND REGULATION ....................................................... 12

IV.  UBER APPEARS ON THE SCENE AND USURPS THE CALIFORNIA

TAXI BUSINESS BY CONVINCING THE CPUC TO CREATE AND LET IT

OPERATE UNDER A "TNC" LICENSE ............................................................ 14


V.  A TAXI HAS A RIGHT TO SEEK REDRESS IN COURT,

*NOT* IN ARBITRATION ........................................................................ 18

F.  CLAIMS FOR RELIEF ........................................................................ 18

FIRST CLAIM FOR RELIEF, AGAINST UBER, FOR VIOLATION OF THE

UNFAIR COMPETITION LAW ............................................................... 18

   a) Unfair Pricing Competition ............................................................. 18

   b) Unfair Cost Expenditure Requirements, such that A TAXI's Costs of

   Operations are far More Expensive, Preventing A TAXI from Fairly

   Competing ............................................................................... 20

   c) Unfair Competition Effected by Disregard of Limits on the Number of

   Licensed Taxicabs Allowed by Local Authorities based upon the issuance of

   Taxicab Franchises by Limited Number of Stickers issued and/or upon

   Findings of Public Convenience and Necessity ..................................... 20

   d) Unfairness because Unlawful ......................................................... 21


SECOND CLAIM FOR RELIEF, AGAINST UBER, FOR VIOLATION

OF THE UNFAIR PRACTICES ACT ..................................................... 23


THIRD CLAIM FOR RELIEF, AGAINST UBER, FOR VIOLATION

OF THE LANHAM ACT (15 *U.S.C.* SECTION 1125(a)) ..................................... 25


FOURTH CLAIM FOR RELIEF, AGAINST UBER, FOR VIOLATION

OF FALSE ADVERTISING LAW .......................................................... 30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIFTH CLAIM FOR RELIEF, AGAINST THE CPUC, MICHAEL PICKER, MIKE FLORIO, CATHERINE J.K. SANDOVAL, CARLA J. PETERMAN, AND LIANE M. RANDOLPH FOR A DECLARATORY JUDGMENT UNDER 28 *U.S.C.* SECTION 2201 INVALIDATING AND DECLARING CPUC DECISION 13-09-045 VOID AS UNCONSTITUTIONAL AND UNCONSTITUTIONALLY VAGUE .... 31

 a) Vagueness as to Intended Operations of TNCs ................................. 33

 b) Vague Insurance Requirements ......................................................... 33

 c) Vagueness as to whether TNCs must comply with the ADA laws ................... 34

 d) Other parts of CPUC Decision 13-09-045 that have not yet been worked out . 35

 e) Deprivation of Substantive Due Process Simpliciter ........................................ 36

 f) Deprivation of Incorporated Substantive Due Process ..................................... 38

SIXTH CLAIM FOR RELIEF, AGAINST THE CPUC,MICHAEL PICKER, MIKE FLORIO, CATHERINE J.K. SANDOVAL, CARLA J. PETERMAN, AND LIANE M. RANDOLPH FOR VIOLATION OF THE CIVIL RIGHTS STATUTES, 42 *U.S.C.* SECTIONS 1983 *ET SEQ.* ....................................................... 39

 a) Denial of Equal Protection ................................................... 40

 b) Denial of Due Process ................................................... 40

  i) Deprivation of Substantive Due Process Simpliciter ........................................ 40

  ii) Deprivation of Incorporated Substantive Due Process ................................... 41

  iii) Deprivation of A TAXI's Due Process Rights based upon TNC Regulation Vagueness ........................................................................... 41

 c) Enabling UBER's Violation of the *Lanham Act* and its acts of Unfair Competition and Unfair Trade Practices ................................................ 42

PRAYER ........................................................................... 43

DEMAND FOR A JURY TRIAL ................................................ 46

TO THIS HONORABLE COURT:

COMES NOW PLAINTIFF A White and Yellow Cab, Inc., a California corporation, also doing business as "A TAXI CAB" and "1-800-4-MY-TAXI" ("A TAXI") and does hereby submit the following Complaint.against Defendants Uber Technologies, Inc.; Rasier, LLC; Rasier-CA, LLC. (collectively "UBER"); the California Public Utilities Commission ("CPUC"); and Michael Picker, Mike Florio, Catherine J.K. Sandoval, Carla J. Peterman, and Liane M. Randolph, each in his or her official capacity as Commissioner of the CPUC, based upon the investigation of counsel and on information and belief, as follows:

*A.  INTRODUCTION AND SUMMARY OF ACTION:*

1.  This action seeks damages and injunctive relief based upon the direct harm and damage that the unfair business, trade practices, and false advertising acts of UBER have caused and continue to cause to A TAXI.  A TAXI is an Orange County-based taxicab company that has been operating for about 29 years in compliance with a complex web of laws and exacting rules and regulations promulgated and maintained by the State of California and the County of Orange, at great effort and expense.

2.  Recently, the CPUC, acting under color of law, allowed UBER to operate *"de facto*" taxis in direct competition to A TAXI, but without requiring UBER to comply with ordinary taxicab regulations, effectively depriving A TAXI of its rights to engage in business.  The CPUC did this by its DECISION 13-09-045, creating a new class of licensing for a "Transportation Network Company" ("TNC") that is in effect a taxicab company which now and traditionally has been regulated by counties and municipalities. The CPUC has not even fully enforced those relaxed TNC regulations against UBER.

3.  OCTAP, which was created under the auspices of *Cal. Govt. Code* section 53075.5 to regulate all taxicab business in Orange County for the public health, safety, and welfare, continues to regulate authentic taxicabs.  OCTAP takes the position that it has no authority to regulate Uber *de facto* taxidrivers since they are not OCTAP

licensees. OCTAP takes the position that it is helpless to stop UBER's operations because they are performed under color of a law by the TNC DECISION approved by the CPUC. OCTAP does nothing to enforce taxi regulations against UBER, which orchestrates the operation of a *de facto* taxicab fleet in direct competition to A TAXI.  UBER drivers in *de facto* taxicabs pick up A TAXI's taxi fares in all of Orange County, including areas that most of the authentic taxicabs are not even allowed to pick up fares since they do not hold a public taxi franchise, such as the City of Anaheim and the John Wayne Airport.  Despite repeated demands for OCTAP to take action against UBER drivers picking up fares in Orange County, OCTAP fails and refuses to take such action.  A TAXI has made alternative demands on OCTAP to enforce its Regulations against UBER drivers of *de facto* taxis, or to allow A TAXI to pick up taxicab fares in Orange County without having to comply with OCTAP Regulations (but instead under the TNC Regulations,) each of which demands OCTAP has also refused.  Instead OCTAP continues to force A TAXI and similarly-situated authentic taxicab companies operating in Orange County (including one of the Plaintiffs in related case number 3-15-cv-01257-JST, Cabco Yellow, Inc. dba California Yellow Cab ("CABCO")) to comply with its Regulations, while allowing UBER *de facto* taxicabs to operate in violation of them.  UBER's acts and omissions allowed under color of law by the CPUC and not prevented by OCTAP, have damaged and threatened A TAXI's continued existence, all in violation of A TAXI's federal civil rights.

4.  A TAXI seeks damages against Defendants UBER, the CPUC, and each of the CPUC Commissioners, compensating A TAXI for its losses and allowing disgorgement of profits and attorney's fees where available.  A TAXI also requests injunctive relief against UBER restraining it from allowing its drivers to operate in Orange County.  A TAXI seeks against the CPUC, a declaratory judgment invalidating and voiding the "TNC" license classification as unconstitutional and declaring that the UBER vehicles and drivers are *de facto* taxicabs and taxi drivers subject to statewide taxicab regulations (and in Orange County, the OCTAP Regulations.)  A TAXI also seeks damages and injunctive relief against the CPUC and its Commissioners based upon their violation of A

TAXI's federal civil rights to continue to seek to fairly compete and to have the opportunity to operate profitably as a taxi company.

*B.  JURISDICTION AND VENUE:*

5.  A TAXI seeks damages, disgorgement of profits, treble damages, attorneys fees and costs, expert witness fees, and the issuance of injunctive relief, based upon the acts of Defendants which violated the Unfair Competition Laws (*Cal. Busn. & Prof. Code* sections 17200 *et seq.*)); the Unfair Practices Act (*Cal. Busn. & Prof. Code* sections 17000 *et seq.*)); the *Lanham Act* (15 *U.S.C.* section 1125(a)); and False Advertising Law (*Cal.Busn. & Prof. Code* sections 17500 *et seq.*).)  A TAXI also seeks a Declaratory Judgment under 28 *U.S.C.* section 2201, and damages and injunctive relief under the Federal Civil Rights Act (42 *U.S.C.* sections 1983 *et seq.*))

6.  This Honorable Court has subject matter jurisdiction under 15 *U.S.C.* section 1121 (*Lanham Act* claims); 28 *U.S.C.* section 1343 (Civil Rights Claims); and 28 *U.S.C.* section 1331 (Federal Question Claims).  This Honorable Court has supplemental subject matter jurisdiction over the State law claims pursuant to 28 *U.S.C.* section 1367(a).

7.  Venue is proper in this Judicial District pursuant to 28 *U.S.C.* section 1391(b)(1) and -(2), since UBER resides in this District, the CPUC maintains its principal place of business in this District, and many of the acts and omissions giving rise to these claims occurred in this District.

8.  UBER and the CPUC are subject to the personal jurisdiction of this Honorable Court by virtue of their respective minimum contacts with the State of California and with the County of Orange.

*C.  INTRADISTRICT ASSIGNMENT:*

9.  Pursuant to *Local Rule 3-5,* this Complaint should be assigned to the San Francisco Division of this District, as the case arose in San Francisco County and UBER and the CPUC are headquartered in this County.

*D.  THE PARTIES:*

10.  Plaintiff A TAXI is a California corporation that maintains its headquarters in the City of Santa Ana, County of Orange, State of California.  A TAXI currently has only about 120 taxicabs on the road.

11.  Defendant Uber Technologies, Inc., a Delaware corporation, maintains its headquarters in San Francisco, CA.

12.  Defendant Rasier, LLC, a Delaware limited liability company, maintains its headquarters in San Francisco, CA.  Rasier, LLC is a subsidiary of  Uber Technologies, Inc., and licenses mobile applications technology from Uber Technologies, Inc.

13.  Defendant Rasier-CA, LLC, a Delaware limited liability company, maintains its headquarters in San Francisco, CA.  Rasier-CA, LLC is a subsidiary of Uber Technologies, Inc.

14.  UBER purports to be orchestrating the operations of its *de facto* taxis and drivers through the use of UBER's smartphone app, under the auspices of a TNC license issued to Rasier-CA, LLC by the CPUC, described in more detail hereinbelow.

15.  Defendant CPUC is a public agency set up and administered by the laws of the State of California.  The stated function of the CPUC is to license, regulate, and enforce matters involving public utilities, including but not limited to, certain aspects of public transportation, for the purpose of protecting the health, safety, and welfare of California residents.

16.  Defendants Michael Picker, Mike Florio, Catherine J.K. Sandoval, Carla J. Peterman, and Liane M. Randloph, are each individuals who are sued in each's official capacity as Commissioner of the CPUC.

///
///
///
///
///

*E.  FACTUAL ALLEGATIONS:*

I.  HISTORY OF LICENSING, PERMITTING, AND FRANCHISING OF TAXICAB OPERATIONS IN THE COUNTY OF ORANGE, AND THE FORMULATION OF OCTAP:

*(i)  Orange County's General Municipal Taxi Regulations*:

17.  Prior to about 1997, taxicab operations in the County of Orange were regulated locally by City, each of which generally-speaking issued a license or permits to an authentic taxi company upon written application, and a company's proof of meeting operational requirements, including the maintenance of commercial auto and liability insurance coverages at certain levels.  The exception to this was the City of Anaheim, which only issued limited numbers of permits or franchise stickers to a limited number of taxicab companies, as described in more detail below.

*(ii) Taxi Operations at Orange County's John Wayne Airport*:

18.  At all times relevant, taxicab operations at Orange County's chief airport (now known as the "John Wayne Airport," or "JWA,") are and have been governed by the County of Orange.  Historically and through the present, JWA has only allowed one or two authentic taxi companies to pick up fares at JWA, and that/those taxi company(ies) and the number of stickers allotted are selected by an involved public bidding and information-collecting process initiated by the issuance of a "Request for Proposal" ("RFP,") followed by a protracted analysis of the bids submitted to determine the most highly-qualified company(ies), and to ultimately award it/them (a) JWA franchise(s).

*(iii) Taxi Operations in the City of Anaheim*:

19.  Prior to about 1987 the City of Anaheim ("Anaheim," or "the City") only issued permits to a single authentic taxicab company - which now operates under the name "Yellow Cab of Greater Orange County" ("YCOC.")  Anaheim taxi permits were issued on a "public convenience and necessity" basis. In about 1987, following a legal challenge A TAXI's predecessor was able to break the Anaheim taxicab "monopoly" enjoyed by YCOC, and also began operating in Anaheim with ten taxicab permits.

20.  In or about the mid-1990s A TAXI was able to secure 40 more Anaheim taxicab permits, so that it held a total of 50 of them.

21.  From about 1997 to 2001 Anaheim was embroiled in legal challenges that attacked without limitation the vagueness of the "public convenience and necessity" standard for the issuance of taxicabs permits.  During this time, Anaheim spent over $100,000 just to pay for studies to determine exactly how many taxicabs it needed to have operating in order to "adequately serve the entire city," and determined that this number was about 165 (plus up to a 15% overage.)

22.  Following (or as the result of) those legal challenges, beginning in the year 2000 Anaheim began converting to a "franchise" rather than a "permit" method of taxicab licensing.  Under this system, authentic taxicab companies could bid against one another for one or more of franchises, and for as many individual franchise stickers as they could manage to secure.  Each franchise was "non-exclusive" in the respect that it had to be shared with any other franchisees, but each would allow the holder to attempt to pick up fares anywhere in the City.  The stickers were specific to the vehicles and were literally affixed to the same by the Code Enforcement Department of the City.  Only taxicabs bearing an Anaheim franchise sticker could pick up fares in the City.

23.  In planning for the new franchise, Anaheim engaged the services of another expert taxicab consultant to assess the "need or necessity" for a number of taxicabs in the City (now up to 230), at an additional cost.  Taxicab franchise RFPs were issued in 2001.  In order to submit a "responsive" bid that might secure a franchise, each taxi company had to submit without limitation detailed evidence about its ownership, management, operations, financial wherewithal, insurance, and fleet; and prove that at least five percent of its fleet complied with the accessibility rules of the Americans with Disabilities Act ("ADA") and that it had a good performance history in all of Orange County and complied with the OCTAP Regulations.  After competition among several authentic taxi companies, in 2002 Anaheim issued a total of 230 (plus a 15% overage) franchise stickers to three companies: 130 to YCOC, 50 to A TAXI, and 50 to CABCO.

24. The Anaheim taxi franchise system has been adjusted and the franchises re-bid and renewed, and Anaheim continues to conduct its authentic taxicab operations under the franchise to this day.  Anaheim has hired more expert consultants to conduct more studies on Anaheim's taxicab needs.  To date Anaheim has paid several hundred thousands dollars for these studies, and remains at the conclusion that it has an aggregate need for no more than exactly 255 taxis (plus a 15% overage) to operate in the City.  The authentic taxicab stickers are now distributed 155 to YCOC, 50 to A TAXI, and 50 to CABCO.  No other authentic taxicab company is allowed to pick up fares in Anaheim at all.  Even among the three franchisees, YCOC is allowed to use only 155 particularly-designated taxis, A TAXI only 50, and CABCO only 50 (plus for each up to a 15% overage) to pick up fares in Anaheim.

*(iv) OCTAP*:

25. In about 1995 the State Legislature amended the *Cal. Govt. Code* to adopt Section 53075.5.  This statute in salient part authorizes and requires "every city or county" within California to "protect the health, safety, and welfare by adopting an ordinance or resolution in regard to taxicab transportation service rendered in vehicles designed for carrying not more than eight persons, excluding the driver, which is operated within the jurisdiction of the city or county."  The statute goes on to mandate that the ordinance or resolution to be adopted at a minimum provide for a policy for entry into the business of providing taxicab transportation service (employment and the maintenance of a valid driver's permit,) "(2)  the establishment or registration of rates for the provision of taxicab transportation service," (and) "(3)(A) A mandatory controlled substance and alcohol testing certification program..."  In particular, the requirements for mandatory controlled substance and alcohol testing are lengthy, detailed, and specific.

26. In response to the creation of *Cal. Gov't. Code* section 53075.5, the County of Orange created OCTAP in about 1997 to license and regulate Orange County taxicab business.  This regulation includes but is not limited to the setting of uniform rates that taxi drivers are required to charge, and the oversight of an elaborate drug and alcohol

1   testing and certification process, including repeated random drug and alcohol testing of

2   drivers.

3           27.   OCTAP is a quasi-governmental regulatory agency operating under the

4   auspices of the County of Orange and the State of California, with its headquarters in the

5   City of Garden Grove, County of Orange.  OCTAP describes itself in section 1.1.1 of its

6   own OCTAP Regulations, as "a voluntary association of Orange County Agencies created

7   to coordinate taxicab service  permitting and other administrative functions with the

8   ORANGE COUNTY TRANSPORTATION AUTHORITY (OCTA) in compliance with

9   *Government Code* section 53075.5 as authorized by participating Agencies."

10          28.   Following its creation, OCTAP developed and to this day maintains a

11  complicated set of Regulations.  OCTAP's Regulations have been adopted by ordinance

12  into the Municipal Code of each municipality ("Member City") in the County of Orange

13  and have thereby become law in all of Orange County.

14              *1)  OCTAP Company, Driver, and Vehicle Permits:*

15          Without limitation, OCTAP requires that every single authentic taxicab

16  company, driver, and taxicab operating in the County acquire and maintain its own OCTAP

17  permit, following detailed application processes.  If OCTAP perceives that a taxicab

18  company, driver, or vehicle for any reason has run afoul of any material OCTAP

19  Regulation, that permit is revoked or suspended, and the company, driver, and taxicab must

20  re-apply to OCTAP in an effort to regain that license.  There is a significant fee that must

21  be paid to OCTAP for each company, driver, and vehicle permit, and the fee must be re-

22  paid upon renewal.  OCTAP stickers proving that a taxicab is authentic and allowed to

23  operate in the County (subject to each municipality's rules) must be placed on each

24  authentic vehicle before it can be operated as a taxicab, and if OCTAP determines that the

25  vehicle's OCTAP permit should be suspended, OCTAP itself has to physically scrape off

26  that vehicle's sticker, which it does, for a fee.  When the sticker can be reapplied, only

27  OCTAP is allowed to replace the sticker (again, for a fee.)

28  ///

*2) OCTAP Insurance requirements:*

The OCTAP Regulations require that each company, driver, and vehicle maintain uninterrupted insurance coverage, and prove it by maintaining a copy of the company's Certificate of Insurance on file.  Currently OCTAP requires the combined single limits of liability to be $1 million.

*3) OCTAP Drug and Alcohol Screening and Certification Requirements:*

OCTAP requires that each driver submit to an extensive background check before ever obtaining an OCTAP driver's permit.  Each driver must submit to "LIVESCAN" fingerprinting and background checking.  Each driver is subject to random drug and alcohol testing, administered periodically by Norton Laboratories.  All of these checks and testing cost money to both the driver of an authentic taxicab and to the taxi company.

*4) OCTAP Taxicab Rates and Calibration/Certification by the Department of Weights and Measures:*

The OCTAP Regulations literally set the exact rates that can be charged by taxicabs picking up fares in Orange County - based upon a "time and charges" analysis which does not change by time of day or night, traffic flow, or demand surges.  OCTAP requires that each authentic taxicab use a taxicab meter to calculate the fare charge, which meter is inspected, calibrated, and "sealed" every year by the County Department of Weights and Measures (much as it calibrates and seals gasoline dispenser pumps) to make sure that the measure of a distance traveled is exact and uniform among all vehicles.  This inspection, calibration, and sealing process costs money that authentic taxi companies must pay.  All authentic taxicabs must use their meters when giving a ride to a fare, and the flag must "drop" at the initiation of a ride and the monetary charges must stop at the ride's conclusion. A TAXI and the other authentic taxicab companies operating in Orange County have no say whatsoever over what rates they may charge, which are dictated by OCTAP.  For example but without limitation, A TAXI and the other authentic taxicab companies cannot implement "surge-pricing," as UBER does.

*5) OCTAP Vehicle Safety Inspections:*

Prior to being placed in service, an authentic taxicab is subjected to a safety and mechanical inspection by OCTAP.  Thereafter, OCTAP subjects each taxicab to random safety/mechanical tests (usually administered annually.)  OCTAP also administers "cursory" inspections on authentic taxicabs on Fridays, on a random basis.  If an OCTAP inspector has any concerns, the taxicab's operation is suspended until it can be repaired, reinspected, and approved by OCTAP personnel, and additional charges accrue.

*6) OCTAP's Limited Personnel and Working Hours:*

OCTAP has a relatively small staff, and its offices are open to the public for inspection work from only 8:00 a.m. to 2:00 p.m., Monday through Friday.  Because of this, there are usually delays in securing vehicle inspections and driver's licenses for authentic taxicabs, resulting in there being a back-up of waiting time, such that authentic taxicab companies and drivers lose money that could have been earned from taxicab operations while waiting for an OCTAP appointment.

## II.  A TAXI'S HISTORY AS AN AUTHENTIC TAXICAB COMPANY, THE PRIOR GROWTH OF ITS FLEET, ITS PRIOR AIRPORT FRANCHISE, AND ITS CURRENT CITY OF ANAHEIM FRANCHISE:

29.  As of September 1, 2013, prior to the time that UBER *de facto* taxicabs began to saturate the market previously enjoyed by authentic taxicabs in Orange County, A TAXI had about 327 taxicabs in its fleet, most of which were most often on the road.

30.  A TAXI worked long and hard and expended large sums of money over 27 years to work up to its position as having 327 cabs on the road, holding one of the only three Anaheim taxi franchises, and operating in most of Orange County, at a profit.

31.  Without limitation, A TAXI's predecessor began operating in Orange County in about 1986 with a fleet of 10 taxicabs.  After initiating legal proceedings it gained the right to operate up to 10 cabs in Anaheim in about 1987.  As its fleet and operations increased, it was able to increase the number of cabs in its Anaheim fleet to 50

by the mid-1990s.  From the years 1996 to 2000, A TAXI even submitted the successful

RFP bid for the JWA taxi franchise, and operated at JWA profitably under its non-

exclusive taxi franchise, before A TAXI lost this privilege to a competitor taxi company.

Thereafter A TAXI submitted additional bids on the JWA taxicab franchise when it came

up for renewal, but each time has been unsuccessful.

32.  From 2000 through the present, despite its best efforts through lawful

channels at great expense, A TAXI, an authentic taxi company, has not been allowed to

pick up fares at JWA, even though A TAXI had a large enough fleet and operations to

perform this work.  The JWA taxi franchise is currently held by "JWA Yellow Cab," which

is a joint venture authentic taxi operation formed of a union of part of YCOC and CABCO.

Even then, only the particular JWA Yellow Cab vehicles specified as holding a JWA taxi

franchise sticker could lawfully pick up fares at JWA; the balance of the YCOC and

CABCO taxis, could not.  Nor could any of authentic taxis that are part of any of the other

Orange County authentic taxi companies, queue or pick up fares at JWA.

33.  From 1997 through the present, each time that the City of Anaheim held

public hearings pertaining to the possible issuance of additional taxi permits, A TAXI

participated in them, and requested and applied for more permits.  Each time that Anaheim

circulated an RFP concerning a taxi franchise, A TAXI responded with a Proposal and

attended all hearings pertaining to the same.  During this period, A TAXI also had to

defend its Anaheim taxi franchises against legal challenges, at additional large expense.  A

TAXI has repeatedly sought to secure more than 50 Anaheim taxi franchise stickers -

generally asking that the number of stickers allotted to it be increased to 100.  A TAXI had

a large enough fleet at the time and could have had the additional stickers affixed to its

additional taxis and had them operating in Anaheim.  A TAXI was unable to increase its

Anaheim operations in this way, however, since Anaheim has failed and refused to issue

additional taxi permits or stickers to A TAXI despite repeated demands.

.////

///

1

2

### III.  TRADITIONAL ROLE OF THE CPUC IN TRANSPORTATION LICENSING AND REGULATION:

3      34.  In 1911, the CPUC was established by Constitutional Amendment as

4  the Railroad Commission.  The Legislature passed the *Public Utilities Act* in 1912,

5  expanding the Commission's regulatory authority; it was renamed as the CPUC in 1946.

6  The CPUC derives its authority and powers from the *California Public Utilities Code.*

7      35.  As noted on the CPUC website, the Transportation arm of the CPUC in

8  relevant part "has regulatory and safety oversight over for-hire passenger carriers

9  (limousines, airport shuttles, charter and scheduled bus operations),..."  The CPUC does *not*

10  have the authority to regulate taxicabs, and it goes out of its way to make clear that it does

11  not regulate taxicabs.  Pursuant to *Cal. Publ. Utils. Code* section 5353(g), taxicab

12  transportation service is "licensed and regulated by a city or county, by ordinance or

13  resolution, rendered in vehicles designed for carrying not more than eight persons

14  excluding the driver."  Instead among individual private for-hire transportation, the CPUC

15  licenses and regulates limousines and airport shuttles, *vehicles which are designed to carry*

16  *more than eight persons excluding the drivers,* through its own involved scheme involving

17  the issuance of either a "transportation charter party" ("TCP") license, or the more difficult

18  and expensive "Passenger Stage Corporation" ("PSC") license after having established that

19  the "public convenience and necessity" require its operations (*Cal. Publ. Utils. Code*

20  sections 1031 *et seq.*)  Under both a TCP and a PSC license, *each driver* must have on file

21  with the CPUC, a Certificate of Insurance proving insurance coverage that requires 30

22  days' notice of cancellation, and must provide that information to the public.

23      36.  The CPUC says the following in its 1/28/11 Publication entitled

24  "BASIC INFORMATION FOR PASSENGER CARRIERS AND APPLICANTS," as an

25  aid to distinguish between taxicabs (which it does not regulate) and passenger carriers

26  (which it does regulate):

27          Based on the information above, it may seem that there is little or no

28          difference between a charter-party carrier and a taxicab.  In fact, *the two are*

*separate and distinct types of transportation.*  A charter-party may not operate as a taxi, *or advertise* as to indicate that it provides taxicab service. Taxis are licensed and regulated by cities and counties, while charter-party carriers operate under authority from the CPUC, subject to the Public Utilities Code and CPUC regulations.  Taxis have meters and top lights; charter-party vehicles do not have either one.  The most important operational difference is that TCP transportation must by <u>prearranged.</u>  Taxis may provide transportation "at the curb", that is, a customer may "arrange" taxi transportation by simply hailing a cab from the sidewalk.  All transportation performed by charter-party carriers must be arranged beforehand, and the driver must have a *completed waybill* in his or her possession at all times during the trip, showing, among other things, the name and address of the person requesting or arranging the transportation (the chartering party), the time and date when the charter was arranged, and whether it was arranged by telephone or written contract, the number of persons in the charter group, the name of at least one passenger, and the points of origin and destination.  (Emphasis in original.)

The written waybill requirements have since been changed; an electronic waybill may now be used.  Still, the requirement that PSC, TCP, and even drivers allegedly operating under a "TNC license" (described under Section IV below) must hold a completed waybill in their possession during the entirety of a trip, remain intact.

37.  Another important distinction between the operations of charter-party carriers and the operations of taxis, is that PSC carriers must charge passengers by "zones" traveled, and TCP carriers (often limousines) must charge by distance, time of use, or a combination of the two,) whereas taxis must charge by "time and distance" as calculated on calibrated taxi meters as explained above, and in accordance with the local agency's set pricing structure.  Authentic taxis cannot charge by zone, and charter-party carriers cannot charge by taxi meters.

IV.  UBER APPEARS ON THE SCENE AND USURPS THE
CALIFORNIA TAXI BUSINESS BY CONVINCING THE CPUC TO
CREATE AND LET IT OPERATE UNDER A "TNC" LICENSE:

38.  Beginning as early as 2011, UBER drivers of privately-owned private passenger vehicles that generally are not capable of legally holding more than eight passengers plus a driver ("*de facto* taxis") began picking up taxicab fares in various areas within the State of California, including the County of Orange.  At this time UBER held no transportation license at all:  UBER held no taxi license, no TCP license, and no PSC license.  UBER also did not yet hold any TNC license (described below,) as one had not even been created at that time.

39.  UBER operates by allowing drivers of private vehicles to use mobile phone apps to receive and respond to requests from private passengers for rides.  The route to be taken by passengers is determined by the app.  Charges for rides are calculated by the mobile apps and charged electronically by UBER and billed to a passenger's account.  A majority portion of the fare is credited to a driver's account by UBER, but a percentage of it is automatically credited to UBER, because drivers share a percentage of their "fares" with UBER.  Further, UBER does not charge a flat 24/7 rate for mileage for traveling the same distance.  Instead, it uses "surge pricing," which UBER describes as specialized increases in the pricing based on calculations of algorithms, charging more money per mile when the demand for cabs is the highest.  UBER also charges a "safe rides fee" of $1 per ride, for no ascertainable consideration.  Authentic taxicabs do not and cannot do any of this, since their mile-and-charges are highly regulated by the State, and in the case of A TAXI and the other Orange County-based companies, by OCTAP as well.  Also, for at least the majority of their tenure of their California operations to date, almost none if not none of the UBER *de facto* taxis were ADA-compliant, as described in more detail below.

40.  At the commencement of UBER's operations in this State, there were no formal checks into the background of UBER drivers, safety checks of the vehicles to be

1  used as UBER *de facto* taxis, or enforced insurance requirements imposed on the UBER

2  drivers or their vehicles.  As explained hereinbelow over time some of those deficiencies

3  have been addressed, but the background checks on UBER drivers, safety checks of their

4  vehicles, and rules for the maintenance of commercial liability insurance remain quite

5  deficient.  These background checks and insurance requirements remain gravely behind and

6  inferior to those required and actually met by, authentic taxis, and TCP or PSC operators.

7            41.  In December 2012 the CPUC initiated an Order Instituting Rulemaking

8  to determine whether and how services arranged through online-enabled apps might affect

9  public safety.  A TAXI and at least many other authentic taxicab companies were not given

10  proper or lawful notice of these proceedings, and in any event would not have expected

11  them to come from the CPUC which by its enabling documents and statutory

12  pronouncements did not license nor regulate taxicab operations.  In its September 2013

13  Decision 13-09-045, the CPUC established a new "transportation network model," - a

14  "TNC" - accepting UBER's argument that it was not a transportation company, but rather

15  only a "ride-sharing app."  The CPUC defined a "TNC" as an "organization whether a

16  corporation, partnership, sole proprietor, or other form, operating in California that

17  provides prearranged transportation services for compensation using an online-enabled

18  application (app) or platform to connect passengers with drivers using their personal

19  vehicles."

20            42.  In November 2014 the CPUC's September 2013 Decision was modified

21  in general to impose facially more stringent insurance requirements ("primary" versus

22  "excess" coverage,) but even these requirements were still diluted in the sense that UBER

23  drivers need not carry full insurance.  The November 2014 Modification Opinion indicated

24  that the Revisions were intended to fill the gap until such time as Legislative Bill AB 2293

25  took effect.  Legislative Bill AB 2293 did take effect in or about September, 2015, and A

26  TAXI believes that this was codified as *Cal. Publ. Utils. Code* sections 5430-5443, but

27  even so the insurance requirements for TNCs are far deficient, inferior, and less

28  comprehensive than the insurance requirements for drivers of authentic taxicabs and for

drivers of TCP- and PSC-permitted vehicles.  Further, the CPUC has chosen to enforce these new statutes in a particularly lenient fashion, never intended by this new legislation. The new legislation requires that UBER maintain current insurance liability at $1 million per occurrence, per driver at the point at which there is a "match accepted" with a located customer or the passenger is actually in the *de facto* taxi.  But unlike its treatment of PSC and TCP licensees, in which the CPUC in order to protect the public requires absolute proof of uninterrupted full insurance coverage *for each driver* in the form of a separately-filed Insurance Certificate that becomes a matter of public record, no insurance policies *for UBER drivers* are required to be on file with the CPUC at all.  Also, insurance policies of authentic taxi, TCP, and PSC companies include Schedules of the individual drivers and vehicles covered in the fleet, making their insurance coverage far more exact and their policy premiums far more expensive.  Not so for UBER drivers: even under its newer regulations the CPUC allows UBER to satisfy its insurance requirements by reference to a driver's personal insurance *if UBER is satisfied* that it will cover *de facto* taxi operations. The CPUC employs an "honor system" by which the CPUC apparently does not even have a record of UBER drivers and vehicles; likely the CPUC does not have any individual driver insurance information on file, at all.

43.  TNCs do not fit the CPUC's own definition of a "rideshare" in order to have given it authority to have formed the new "TNC" class.  Under *Cal. Publ. Utils. Code* section 5353(h)(3), a company is not a "rideshare" if the primary purpose for the transportation is to make a profit; and the primary purpose of UBER is to make a profit.

44.  Even with the enactment of AB 2293, its changes to TNC regulations will not prevent UBER from operating *de facto* taxis in California without the benefit of the regulations upon authentic taxi drivers and vehicles, and without the maintenance of primary commercial liability insurance on the drivers.

45.  A TAXI maintains that UBER does not fall under regulation as a charter-party carrier or even as a TNC, because its trips are not "prearranged."  Many of the passengers reaching out to A TAXI (and/or contacting most if not all of the taxi companies

in the related case) for a taxi ride, also have the ability to, and do, make reservations on-line.  This does not detract from the authentic taxi companies' identity and regulation as a taxi company, since they are still legally authorized to pick up fares "at the curb."  UBER itself is on record as admitting that it does not "prearrange" its pick-ups, and that it cannot reserve orders for more than a half hour in advance.  Further, UBER drivers regularly pick up fares "at the curb" just as authentic taxi drivers do.

46. According to the comment on AB 2293 contained in the "LEGISLATIVE COUNSEL'S DIGEST,"

> "[T]his bill would more broadly define 'transportation network company' by excluding the requirement that a transportation network company be prearranged."

Such a change completely contradicts the CPUC's own 2011 Publication, which maintains that a charter-party carrier cannot pick up "at the curb."  The lifting of the requirement that a TNC fare be "prearranged" by UBER, purports to allow UBER drivers of *de facto* taxis to pick up taxi fares at the curb and to queue at hotels and places of business with impunity to regulation, in direct and full, unfair competition to the authentic taxi operations of A TAXI and the taxi Plaintiffs in related case number 3-15-cv-01257-JST.

47. UBER regularly markets itself as comparable to taxi service or as offering the same services as an authentic taxi, while making false and misleading statements about its safety and background checks as alleged in more detail hereinbelow.

48. To date based upon its unsafe operations, the criminal and grossly negligent acts of its drivers, its false and misleading statements, and its unfair business practices, UBER has been banned or suspended from operations for at least a length of time in, without limitation, the U.S. Cities of Portland, Oregon; Las Vegas, Nevada; Cambridge, Massachusetts; Richmond, Virginia; and Little Rock, Arkansas, and in all or important portions of the Countries of India, Germany, France, Spain, Brazil, and the Netherlands. Litigation seeking in relevant part to shut down UBER's California operations is also pending via Complaints brought by the San Francisco City and County and Los Angeles

County District Attorneys' Offices on behalf of the People of the State of California in San Francisco Superior Court case #CGC 14-543120 ("the SFSC State Case,") and by 19 California authentic taxicab companies in the above-referenced related case.  A TAXI contends that attempts to halt UBER's California operations have been ineffective, delayed, and made more difficult as a direct result of the acts of the CPUC, taken under color of law, creating new regulations authorizing the operations of TNCs, and not even enforcing UBER's violations of them.

## V.  A TAXI HAS A RIGHT TO SEEK REDRESS IN COURT, *NOT* IN ARBITRATION.

49.  A TAXI has never signed a contract with UBER containing any sort of arbitration provisions that would cover these claims.  Any agreement between UBER and customers that contains an alleged arbitration provision does not apply to A TAXI, as A TAXI has never exploited such an agreement.  To the contrary, A TAXI has been financially harmed by all of UBER's operations as alleged herein.

*F.  CLAIMS FOR RELIEF:*

*FIRST CLAIM FOR RELIEF, AGAINST UBER*
*FOR VIOLATION OF THE UNFAIR COMPETITION LAW*

50.  A TAXI incorporates paragraphs 1 through 48, Inclusive of this Complaint hereinto as though set forth at length.

51.  A TAXI has a decades-long track record of operating as a taxicab company for a monetary profit, its primary income being derived from taxicab fares.

52.  By virtue of its having competed, having met and continued to meet the requirements, and paying the fees, A TAXI presently holds one of only three City of Anaheim taxi franchises.  Under its Anaheim franchise, A TAXI holds 50 of an aggregate 255 franchise stickers, through which no more than 255 taxicabs (plus a 15% overage) may lawfully pick up fares in Anaheim at any given time.  Even with its fleet at only about a

1  third of what it was two years ago because UBER *de facto* taxis and drivers are taking A

2  TAXI's fares, about eight percent of A TAXI's fleet still consists of ADA-accessible

3  vehicles.  A TAXI's Anaheim taxi franchise is valid by its own terms until the year 2022.

4  A TAXI has a vested property right to be one of the only three taxicab companies allowed

5  to pick up taxi fares in Anaheim, and has a vested property right to earn about 20% of the

6  earnings (its expected 20% market share) from picking up of taxi fares in Anaheim.

7          53.  UBER has operated and continues to operate *de facto* taxicabs in all of

8  the areas in which A TAXI operates authentic taxicabs, including the City of Anaheim and

9  all of Orange County.  UBER now even picks up fares at JWA by "staging" its *de facto*

10 taxis in lots near to JWA so that its drivers can be near to the deplaning passengers who

11 may want a taxi ride (something that no taxis from authentic taxi companies save those

12 holding the JWA taxi franchise are allowed to do,) in direct competition to all of the

13 authentic Orange County-based taxi companies.

14          54.  On a daily basis UBER unfairly competes directly with A TAXI for the

15 same fares that A TAXI would otherwise obtain, and UBER secures those taxi fares in

16 place and in stead of A TAXI, all to A TAXI's direct damage, in the following ways, all of

17 which were explained in more detail hereinabove:

18          a) *Unfair Pricing Competition:*  UBER does not charge taxi fares in the

19 "time and charges" method and amount required by OCTAP for all taxicabs operating in

20 Orange County.  A TAXI's fares can only be calculated by "time and charges" based upon

21 taxicab meters that are regulated, calibrated and sealed by the County Department of

22 Weights and Measures.  UBER does not do any of this.  Instead, UBER charges rates based

23 on its own pricing model, without any regulation or oversight by any regulatory authority;

24 and UBER's rates include special "surge pricing."  UBER charges an extra $1 per ride

25 "safe ride fee," which as far as A TAXI is aware, has no specific purpose except to deceive

26 its customers, so that UBER earns an extra $1 for each ride. A TAXI and the other

27 authentic taxi companies do not and could not do this.

28 ///

b) *Unfair Cost Expenditure Requirements, such that A TAXI's Costs of Operations are far More Expensive, Preventing A TAXI from Fairly Competing:* A TAXI complies with all County and State laws in order to operate as an authentic taxicab company, at great effort and expense. UBER on the other hand does not. UBER vehicles are not subject to scrupulous inspections and its drivers are not subject to involved background checks which also include LIVESCAN fingerprinting and random drug testing. A TAXI and the other authentic taxicab companies maintain uninterrupted primary commercial auto and liability insurance from reputable insurers, with each driver and vehicle named on the policy, at a great increase in the premium price. UBER does not do this; even with the recent changes to the TNC laws, its drivers need not be insured with such high primary limits of coverage. A TAXI maintains all required OCTAP licenses and upholds all requirements of the Anaheim taxi franchise Ordinance, and pays OCTAP fees and franchise fees to the City of Anaheim; UBER does not. A TAXI complies with all driver and vehicle inspections imposed by OCTAP and the City of Anaheim and pays all costs associated with them; UBER does not. A TAXI has at significant expense outfitted and maintains eight percent of its fleet as ADA-accessible vehicles; UBER does not. As alleged in more detail below, until recently, UBER made no provision for transporting any person with disabilities. In response to complaints UBER has begun making some arrangements for ADA-accessible vehicles, but such arrangements fall short of those implemented and practiced by A TAXI and other authentic taxicab companies, and do not rise to the level of those required by the ADA laws, OCTAP, and the City of Anaheim.

c) *Unfair Competition Effected by Disregard of Limits on the Number of Licensed Taxicabs Allowed by Local Authorities based upon the issuance of Taxicab Franchises by Limited Number of Stickers issued and/or upon findings of Public Convenience and Necessity:* Authentic taxi companies including A TAXI must compete with one another for a limited number of taxi franchises (including the one in Anaheim and in other areas of the County.) For example, even though A TAXI spent great effort and expense responding to Anaheim's taxi RFP, submitting a responsive bid, and ultimately

securing one of the only three Anaheim taxicab franchises, it is still limited to operating only 50 taxicabs (plus a 15% overage) in that City at any given time.  UBER *de facto* taxis, while never competing for (much less securing) a coveted Anaheim taxi franchise, do not. Instead, UBER merely operates in most of Anaheim to its greatest capacity possible with no limits to the number of *de facto* UBER cabs that pick up fares there.  UBER does the same thing for the other exclusive parts of Orange County that require a special taxi license, including JWA.  Regardless of the fact that UBER does not even have any taxi license at all, much less hold the single exclusive JWA franchise that most if not all of the larger Orange County authentic taxi companies applied for (also at great effort and expense,) UBER drivers are now picking up fares at JWA.  Thus while authentic taxi companies following lawful taxi regulations are not allowed to pick up fares in certain parts of  Orange County despite having spent much time, effort, and money chasing this privilege, UBER, which never even pretended to attempt to comply with those regulations, directs it drivers of *de facto* taxis to pick up those fares.

        d) *Unfairness because Unlawful:*  UBER's acts and omissions as alleged herein, in operating *de facto* taxis without complying with the OCTAP Regulations, Chapter 4.73 of the *Anaheim Municipal Code* which regulates taxicab operations in the City and requires that such operations must take place pursuant to all of the regulations of the Anaheim Taxicab Franchise, *Orange County Municipal Code* section 5-3-359 which only allows taxicab pick-up service at John Wayne Airport pursuant to a public franchise contract, and other laws, were and continue to be unlawful.  Through UBER's disregard of these laws UBER unfairly competes and gains a great monetary, reputation, and market share advantage over A TAXI and similarly-situated Orange County-based authentic taxicab companies that must spend the time, energy, and money to comply with all of these laws and regulations, and that (unlike UBER) limit their taxicab operations to the confines and constrictions of these laws and regulations, all to A TAXI's damages as alleged herein.

///

///

55.  UBER's acts and omissions in directly competing with A TAXI for the same limited amount of passenger business, through the use of unlicensed, unregulated, underinsured, and non-ADA compliant, *de facto* taxis and drivers, and/or UBER's commission of Unfair Practices within the meaning of *Cal. Busn. & Prof. Code* sections 17000 *et seq.*, and/or UBER's commission of unlawful acts as alleged above, constitute unfair and unlawful business acts or practices.  UBER's acts and omissions as alleged herein constitute unfair business acts or practices which threaten an incipient violation of an antitrust law, violate the policy or spirit of an antitrust law, and/or significantly threaten or harm competition, because they totally deprive A TAXI of its ability and right to compete in the field in which it has a vested interest, and are destroying or at least significantly threatening to destroy competition by putting A TAXI and/or other of the authentic taxicab companies in Orange County and in the State of California, out of business, or at least seriously crippling their business.  UBER's acts and omissions as alleged herein are or were also contrary to public policy, as for years UBER made no provision for the transport of passengers who require ADA-compliant vehicles (and even now make only limited and insufficient provision for ADA-compliance,) yet UBER's acts and omissions have the probable effect of destroying competition by putting authentic taxi companies out of business, all such that passengers with special disabilities' needs will be prevented from receiving adequate or sufficient "demand responsive" transportation service.

56.  As a direct result of UBER's acts of unfair competition, A TAXI has been damaged in the loss of money that it would have earned from fares, had UBER not directly taken that money from passengers who would have taken a taxi ride with A TAXI instead.  As a direct result of UBER's acts of unfair competition, A TAXI has also suffered a severe decrease in market share, has lost investment and earning capacity, and has sustained damage to reputation and incidental and coincidental damage in an amount and manner according to proof.

///

57.  UBER has profited substantially and received ill-gotten gains in the

form of money and increase in reputation from its unfair and unlawful business practices described herein.  In particular but without limitation UBER took money in the form of its receipt of *de facto* taxicab fares it collected from fares that commenced in the City of Anaheim in which A TAXI had a 20% vested ownership interest pursuant to A TAXI's confirmed Anaheim taxicab franchise, that A TAXI would have received instead of UBER, but for UBER's acts of unfair competition.  UBER further harmed A TAXI in its reputation in Anaheim by taking this part of A TAXI's Anaheim business and profits from it.  A TAXI is entitled to restitution from UBER, of A TAXI's approximate 20% market share of the Anaheim taxicab fares that A TAXI would have received, but for UBER's wrongful acts as alleged herein.

58. A TAXI also respectfully requests that a temporary restraining order and a preliminary and permanent injunction be issued by this Honorable Court pursuant to *Cal. Busn. & Prof. Code* section 17203, enjoining UBER's acts of unfair competition as alleged herein.

## SECOND CLAIM FOR RELIEF, AGAINST UBER
## FOR VIOLATION OF THE UNFAIR PRACTICES ACT
(*Cal. Busn. & Prof. Code* sections 17000 *et seq.*)

59. A TAXI incorporates paragraphs 1 through 56, Inclusive of this Complaint hereinto as though set forth at length.

60. UBER's creation, advertising, and distributing of its app for ridesharing described in more detail hereinabove constitutes a production, manufacture, distribution or sale of an article or product of general use or consumption within the meaning of *Cal. Busn. & Prof. Code* section 17040.

61. As alleged and described hereinabove, A TAXI and the other authentic taxicab companies, which must follow state as well as various county and city regulations (including without limitation in the case of A TAXI, the OCTAP Regulations and the Anaheim Taxi Franchise Ordinance,) has significant operating and regulatory expenses,

1    while UBER does not have those same expenses, or to the extent that it has operating and

2    regulatory expenses, UBER is only is required to pay, comparatively, a smaller percentage

3    of operating and regulatory expenses per vehicle operating as a *de facto* taxi.  As further

4    alleged hereinabove, the majority of the operating and regulatory expenses of A TAXI are

5    set by outside agencies, and it is generally not within A TAXI's ability to decrease those

6    expenses to any substantial extent without decreasing its ability to operate or decreasing the

7    number of taxicabs in its fleet that are operating.

8        62.  UBER continues to operate in Orange County and other parts of the

9    State as a *de facto* taxi company, without compliance with any of the taxicab regulations

10   and ordinances, including those established by the City of Anaheim and the County of

11   Orange at the John Wayne Airport, setting its own prices rather than complying with the

12   taxi pricing required by OCTAP, and otherwise engaging in the acts of unfair competition

13   hereinabove.  The prices that UBER sets for its rendition of *de facto* taxi service are less

14   than those that must be charged by A TAXI and other authentic taxicab companies, which

15   must be higher in order to meet their actual cost of doing business, and which regardless are

16   for the most part set by OCTAP and non-negotiable.  UBER's such acts and omissions are

17   undertaken with the intent to destroy the competition of A TAXI, a regular established

18   dealer in the taxicab business, all to A TAXI's direct loss as alleged herein.  Anti-

19   competitive effect can be presumed from the fact that UBER has, within the meaning of the

20   *Unfair Practices Act* ("UPA,") distributed or sold and continues to distribute or sell, *de*

21   *facto* taxicab services through its app at charges which are below costs for A TAXI and the

22   other authentic taxi companies, to their direct monetary loss.

23       63.  UBER's acts and omissions alleged hereinabove constitute unfair,

24   dishonest, deceptive, destructive, and discriminatory practices by which fair and honest

25   competition from A TAXI and other authentic taxi companies is destroyed or prevented

26   within the meaning of *Cal. Busn. & Prof. Code* section 17001.

27   ///

28   ///

64. UBER's acts and omissions alleged hereinabove also violate *Cal. Busn. & Prof. Code* section 17047, in that UBER regularly through internet and cell phone advertising, solicits drivers to operate *de facto* taxicabs on behalf of UBER in order to violate the UPA.

65. A TAXI claims entitlement to an award of treble damages pursuant to *Cal. Busn. & Prof. Code* section 17082 for all actual damages that A TAXI has sustained as a result of UBER's violation of the UPA.

66. Pursuant to *Cal. Busn. & Prof. Code* section 17078, A TAXI respectfully requests the issuance of a Temporary Restraining Order or the setting of an Order to Show Cause re: the issuance of a Temporary Restraining Order, and the issuance of a Preliminary Injunction, enjoining UBER from doing all of the acts which are prohibited under the UPA as alleged herein. A TAXI also respectfully requests that this Honorable Court in its discretion pursuant to *Cal. Busn. & Prof. Code* section 17079 include in any injunction such other restraint as it may deem expedient in order to deter UBER from, and insure against, its committing a future violation of the UPA. A TAXI further respectfully requests that no bond be required for the issuance of an interim and final injunction, pursuant to *Cal. Busn. & Prof. Code* section 17081.

67. A TAXI also requests an award of attorney's fees and costs pursuant to *Cal. Busn. & Prof. Code* secton 17083.

*THIRD CLAIM FOR RELIEF, AGAINST UBER*

*FOR VIOLATION OF THE LANHAM ACT (15 U.S.C. SECTION 1125(a))*

68. A TAXI incorporates paragraphs 1 through 66, Inclusive of this Complaint hereinto as though set forth at length.

69. As alleged hereinabove, A TAXI is an authentic taxi company and UBER operates a *de facto* taxi company without complying with the State and County regulations required of an authentic taxi company. UBER operates in direct competition with A TAXI for a limited amount of public livery rides for hire by passenger vehicles that

1   hold less than 8 passengers, and UBER has been taking and continues to take A TAXI's
2   taxi fares from it.  Almost every taxi fare that UBER receives in Orange County, is a fare
3   that A TAXI could have received but is deprived of the chance to even compete for same,
4   by UBER's acts.

5          70.  Since commencing its operation of *de facto* taxis as alleged hereinabove,
6   UBER has made and continues to make false or misleading statements and to use unfair
7   and deceptive advertising concerning the safety of its operations and its pricing in
8   commercial advertisements about its app product, with the specific intent of targeting those
9   who are now, in the past have been, or in the future would have been, A TAXI's customers,
10  and stealing the business of those customers or potential customers from A TAXI.  UBER's
11  campaign is directly targeted to compete with the traditional taxicab service that A TAXI
12  offers, in that UBER in its advertising repeatedly uses comparative or superlative
13  adjectives, intended to draw attention to itself as being the best or at least better than
14  traditional (authentic) taxi service, which is always touted by UBER as begin deficient.
15  These statements are made as if they are statements of fact rather than mere "puffery" or
16  statements of intent or aspiration.  Those false or misleading statements, and the reasons
17  that they were or are false and misleading, include that:

18          a)  UBER stated in its advertising that it was the "safest" passenger ride, and
19  the "safest ride on the road" (meaning, that its rides were safer than authentic taxicabs,
20  including those of A TAXI.)  UBER also referenced that it had the "strictest safety
21  standards possible."  Until October 2014, statements that the $1 "Safe Rides Fee" (which
22  UBER automatically charged each passenger at the conclusion of his or her ride), was
23  assessed to support UBER's efforts to ensure that UBER's drivers and riders would enjoy
24  the "safest possible platform"; this was stated on UBER's website.  UBER's  advertisement
25  about the "safe rides fee" also misleads and misrepresents to the effect that it intentionally
26  results in a customer reasonably concluding that a ride in an authentic taxicab is *less* safe,
27  because a traditional taxicab company is not gathering that extra $1 per ride that
28  supposedly greatly enhances the safety of an UBER ride.  UBER also stated in advertising

in early 2014 after one of the drivers of its *de facto* taxi had struck and killed a 6-year old

girl, that "We are committed to improving the already best in class safety and

accountability of the UBER platform, for both riders and drivers."  These statements were

made by UBER for the purpose of deceiving, and actually did deceive, the public, since

UBER's use of the superlative adjective "safest" left no room for a prospective passenger

to doubt that UBER's rides, drivers, and operations were safer than those of authentic taxi

companies.  In making this advertisement UBER misrepresented that it was impossible that

the operations of an authentic taxi company could be as safe as UBER's.  UBER's

representation that it was the "safest ride on the road" (intending that it be compared

favorably above the rides of authentic taxi companies) was and is also false, deceptive, and

misleading, because as explained hereinabove, drivers of A TAXI cabs are repeatedly and

randomly tested for substance use, and A TAXI vehicles are regularly inspected and subject

to inspection by OCTAP personnel.  UBER drivers and vehicles are not.  Instead, once they

are put "on the road," it is not the policy of UBER for any of its *de facto* taxis to be

reinspected or to see that its drivers are checked again for substance abuse.  Because per the

law of entropy objects subject to use tend to wear out, and by the general nature of things

people change, unlike A TAXI's manner of doing business, UBER's failure to perform

follow-up inspections of its vehicles and drug testing on its drivers means that its rides

would not be (nor continue to be) "safer" than those of authentic taxi cabs and drivers.

Further, UBER drivers are expected to follow their special on-line navigation app to reach

their destination while driving and are thus distracted while driving, adding to the peril of

the trip, while drivers of authentic taxicabs are not and are not distracted in this way,

making the trip in an authentic taxicab "safer."  Further, since many drivers of UBER *de*

*facto* taxis also simultaneously work for other competitor TNC-licensed *de facto* taxicab

companies, they have been known to "juggle" several smartphones with the apps of these

competing companies looking for additional *de facto* taxicab jobs *while driving,* thus only

adding to their distraction and increasing the unsafe nature of their trip, especially

compared to a ride in an authentic taxicab by a driver who is not so distracted.

b)  UBER claimed in its advertising that it uses or used "industry-leading standards" to vet its drivers (advertisements made through at least October 29, 2014 on UBER's website,) and that the drivers had to go through rigorous background checks that "lead the industry" (contained on the Blog of Lane Kasselman, UBER's Head of Communications for North America through at least December 10, 2014.)  UBER further claimed in advertising that its driver background checks were "often more rigorous that what is required to become a taxi driver," and that it employs "background checks you can trust."  Each of these are actionable statements of fact because they are subject to objective verifiable fact, were false, were made by UBER with the actual purpose of deceiving, or in reckless disregard of deceiving, the public, including A TAXI's customers and potential customers, and did in fact deceive those persons just as UBER had intended, all to A TAXI's monetary and reputation damage as alleged herein.  The "industry" into which UBER thrust itself in order to unfairly compete, was and is the taxicab industry.  The "leading standard" in the California taxicab industry for vetting taxi drivers, is the use of "LIVESCAN" fingerprinting and Federal and State records background checks, which is the system that A TAXI uses.  LIVESCAN conducts the authentic taxi companies' drivers' fingerprinting checks by access through the Department of Justice and FBI systems that have no time-based nor jurisdictional limits.  At its outset of California operations, UBER actually used very little driver background checking at all, and while UBER has tightened its driver background checking, UBER drivers are still only "checked" by "Hirease" or Sterling" systems, which while being much less expensive, do not use fingerprint identification (such that they themselves are subject to fraud,) are limited by time and geographical area, and "miss" many red-flags of problem drivers.  Further, drivers of authentic taxicabs must pass written examinations in advance of licensing; UBER drivers of *de facto* taxicabs do not.

71.  Each of the above-described statements was disseminated sufficiently to the relevant purchasing public, and either actually deceived or had the capacity to deceive a substantial segment of A TAXI's existing or potential customers.

72. Each of the above-described statements caused deceptions that were material to A TAXI's passengers and potential passengers, in that they were likely to and did influence the purchasing decision of A TAXI's existing or potential customers, and to cause those customers to select UBER for a *de facto* taxi ride, rather than taking a taxi ride in an authentic A TAXI cab.

73. A TAXI's product or service is one engaged in interstate commerce, as even though A TAXI is licensed in the State of California, it is fully authorized to drop off passengers in another state. UBER's product or service also is engaged in interstate (and even international) commerce, as it markets itself regularly and repeatedly by internet and by cell phone texts that are transmitted via interstate and international wire and signal.

74. As alleged hereinabove, A TAXI has been or is likely to be and to continue to be injured in income, profits, earning capacity, market share, and reputation as the direct result of UBER's violation of the *Lanham Act* alleged herein.

75. A TAXI claims entitlement to treble the amount of UBER's profits pursuant to statute, or whatever sum in excess of actual damages this Honorable Court in its discretion may deem appropriate. A TAXI also seeks an award of its own damages and/or its "marketplace damages." A TAXI further respectfully request that this Honorable Court award it damages for prospective corrective advertising expenditures in an amount according to proof.

76. A TAXI alleges that this is an exceptional case by virtue of the very egregious nature of UBER's misconduct, and respectfully claims entitlement to an award of fees and costs incurred in this action on that basis.

77. A TAXI also respectfully requests the issuance of temporary, preliminary, and permanent injunctive relief against UBER, restraining it from its continued violation of the *Lanham Act* and/or ordering UBER to correct the problems caused by its false advertising, on the basis that UBER's challenged misrepresentations are literally false or have a tendency to deceive consumers.

///

*FOURTH CLAIM FOR RELIEF, AGAINST UBER*

*FOR VIOLATION OF THE FALSE ADVERTISING LAW*

78.   A TAXI incorporates paragraphs 1 through 76, Inclusive of this Complaint hereinto as though set forth at length.

79.   Without limitation and without limiting the breadth and generality of the foregoing allegations in this Complaint, UBER engaged in false advertising by making and disseminating statements to consumers to the effect that its drivers were subject to more rigorous backgrounds checks and its rides were "safer" than taxi rides, or the "safest" ride available.  At the time that UBER caused these statements and misrepresentations to be disseminated, it knew or should have known that they would be likely to mislead and deceive A TAXI's customers and potential customers.

80.   In disseminating each of the above-described false and misleading representations about its services, and falsely and in a misleading fashion comparing its *de facto* taxi services as superior to the authentic taxi services offered by A TAXI and the other authentic taxi companies to consumers, existing and potential customers of A TAXI who were deceived and mislead by them, UBER  engaged in false advertising in violation of *Cal. Busn. & Prof. Code* sections 17500 *et seq.*

81.   A TAXI has suffered injury in fact and has lost income, profits, and earning capacity, and has sustained a diminution in market share and reputation as a direct result of the false advertising acts of UBER as alleged hereinabove.

82.   UBER's acts of false advertising as alleged herein were a substantial factor in causing harm to A TAXI and allowing UBER to instead receive taxi fares that A TAXI should have received, in particular A TAXI's vested ownership interest in approximately 20% of the Anaheim taxicab business.  Thus, UBER received ill-gotten gains and/or profits and has been unjustly enriched at the expense of A TAXI.  Pursuant to *Cal. Busn. & Prof. Code* section 17535 A TAXI respectfully requests restitution of all sums obtained by UBER instead of A TAXI in violation of the false advertising statutes.

///

83. A TAXI lacks an adequate remedy at law to rectify the past, ongoing, and future wrongful acts and omissions of UBER, and if UBER is not enjoined from their commission, A TAXI will suffer irreparable harm and/or injury. A TAXI respectfully requests the issuance of temporary, preliminary, and permanent injunctive relief against UBER, restraining it from continuing to engage in false advertising.

*FIFTH CLAIM FOR RELIEF, AGAINST THE CPUC,*

*MICHAEL PICKER, MIKE FLORIO, CATHERINE J.K. SANDOVAL,*

*CARLA J. PETERMAN, AND LIANE M. RANDOLPH,*

*FOR A DECLARATORY JUDGMENT UNDER 28 U.S.C. SECTION 2201*

*INVALIDATING AND DECLARING CPUC DECISION 13-09-045*

*VOID AS UNCONSTITUTIONAL AND UNCONSTITUTIONALLY VAGUE*

84. A TAXI incorporates paragraphs 1 through 82, Inclusive of this Complaint hereinto as though set forth at length.

85. As a state regulatory agency whose predecessor was established by Constitutional Amendment, and which itself was created under the *Cal. Publ. Utilities Code* (the "Code") as alleged hereinabove, the CPUC is subject to all of the provisions of the *Constitution*, and derives all of its enabling powers from the *Constitution* and the Code.

86. Any acts taken by the CPUC that have effect or impact on those residing or situate in the State of California, especially those it regulates and those who are directly affected by its regulations, must be undertaken in accordance with the Constitution, must be taken pursuant to the authority granted to it under the Code, and should not conflict with existing law. Acts that are unconstitutional, that are in excess of its statutory powers, or are in direct conflict with existing laws, are void or voidable.

87. Acting through its Commissioners Michael Picker, Mike Florio, Catherine J.K. Sandoval, Carla J. Peterman, and Liane M. Randloph (collectively, "the Commissioners") the CPUC made and entered CPUC Decision 13-09-045 in excess of and in contradiction to its own authority. *Cal. Publ. Utils. Code* section 5353(g) specifies that

1  taxicab transportation service is "licensed and regulated by a city or county, by ordinance

2  or regulation..." and *not* by the CPUC. The CPUC admits that in Orange County,

3  California, taxicabs are regulated not by it but are instead regulated pursuant to *Cal. Govt.*

4  *Code* section 53075.5 (and thus by OCTAP.) The CPUC's authority to regulate private for-

5  hire livery auto transportation is limited to licensing under the Passenger Charter-party

6  Carriers' Act of *Cal. Publ. Utils. Code* section 5351 *et seq.*(the "Act.")

7      88. In enacting CPUC Decision 13-09-045, by which the CPUC authorized

8  UBER and other app-based platforms to operate *de facto* taxicab companies with *de facto*

9  taxicabs and drivers, the Commissioners undertook to cause the CPUC to regulate taxi

10  business that its own enabling statutes (the Code) had already relegated to local agencies,

11  which was in excess of all of their powers and authority, and which was in direct

12  contradiction to *Cal. Govt. Code* section 53075.5. Such act is void or voidable. Further, all

13  Decisions of the CPUC purporting to modify Decision 13-09-045 are also void and

14  voidable. Finally, AB 2293 as amended and its codification in *Cal. Publ. Utils. Code*

15  sections 5430-5443 should be declared a nullity as void or should be voided, because they

16  seek to codify and legitimatize part of a void or voidable act by the Commissioners of a

17  regulatory authority that acted in excess of their authority.

18      89. In addition to being void or voidable for the reasons stated above, CPUC

19  Decision 13-09-045 is also void or voidable as unconstitutional under the *Fifth* and

20  *Fourteenth Amendments to the U.S. Constitution.*

21      90. A TAXI is a "person" within the meaning of the relevant portions of the

22  *Fifth* and *Fourteenth Amendments to the U.S. Constitution* alleged herein.

23      91. A TAXI had a vested property right to offer taxicab service in the

24  County of Orange pursuant to its OCTAP permits, without competition from other taxicabs

25  except those also licensed and regulated by OCTAP.

26      92. By virtue of its holding an Anaheim taxi franchise for 50 permits (plus a

27  15% overage,) A TAXI had a vested right to operate up to 50 taxicabs (plus a 15%

28  overage) in the City of Anaheim, without any taxicab competition other than that of the

other two Anaheim taxi franchisees - YCOC and CABCO - and then, only to the extent of their specifically-designated limited number of Anaheim taxi franchise stickers.

93. Due process guarantees to persons (including A TAXI) under both the *Fifth* and the *Fourteenth Amendments to the U.S. Constitution*, require that a law that is too vague for the average citizen to understand is invalid as void or voidable.

94. CPUC Decision 13-09-045, under the circumstances through which is was created and is being enforced, is unconstitutionally void, as its provisions are too vague for the average citizen to understand.  This vagueness includes but is not limited to:

*a) Vagueness as to Intended operations of TNCs:*  The CPUC admits in its 11/20/2014 "DECISION MODIFYING DECISION 13-09-045," ("MODIFICATION"), page 6, that:

> "D.13-09-045 did not specifically define TNC services other than to say for
> the purpose of TNC services, a ride is considered prearranged if the ride is
> solicited and accepted via a TNC digital platform before the ride
> commences."  (fn. om.)

Yet UBER's statements that it does not "prearrange" rides (more than a half hour in advance) begs the questions of what it even means to be "prearranged," since UBER's ability to qualify as a TNC is based upon it orchestrating "prearranged" rides.  This is vague.  Since the CPUC had its own built-in prohibition against regulating taxicab service, it is reasonable to expect that the CPUC did not actually intend to create its own new class of taxi regulation, but this is what the CPUC has done on a *de facto* basis, and all to A TAXI's damage as alleged herein.

b) *Vague Insurance Requirements:*  These were unconstitutionally vague when the CPUC created and authorized the use of the TNC permit, as it was unstated and unclear what nature, type and levels of insurance are required by drivers, compared to what is required by UBER (e.g., "Primary" insurance?  "Excess" insurance?  "Multiple policies"?  "Stacking"?  "Combination" policies?  "Policies for Period 1"?  "Period 2"? "Period 3"?)  Despite attempts to modify CPUC Decision 13-09-045 in 2014 through the

MODIFICATION, and later attempts to clarify it through AB 2293 and otherwise, it still is ambiguous as to who (UBER or the drivers of the *de facto* taxis) must insure the vehicles and at what stage, and who is responsible for enforcing such compliance.  Even now the CPUC continues to debate about issues to be determined at the "Next Phase of TNC Proceeding" pursuant to a new proceeding initiated on April 28, 2105, debating changes to be made to the TNC licensing scheme pursuant to this "Phase II."

c)  *Vagueness as to whether TNCs must comply with the ADA laws:*  CPUC Decision 13-09-045 is silent on the subject of compliance with the ADA laws, although the ADA contains an entire Part entitled "Transportation Service for Individuals with Disabilities" (49 *C.F.R.* part 37.)  UBER's two-page "ACCESSIBILITY PLAN" filed with the CPUC on or about November 7, 2013 contained only precatory statements to the effect that it would "develop" a plan.  In contrast, the operators of vehicles licensed by the CPUC under the *Charter Party Act* are required to commit to compliance with the ADA rules and to include ADA-compliant vehicles among their fleets *from the outset* of their licensing, and must commit to maintaining a certain percentage of ADA-accessible vehicles, ones which (for example but without limitation) can store and carry wheelchairs and are modified so as to facilitate a ride by a disabled person.  Further, the drivers of those ADA-accessible vehicles have to receive special training in ADA access and assistance.

Section 37.29 of the ADA covers "Private entities providing taxi service," and part (a) thereof mandates that "(a) Providers of taxi service are subject to the requirements of this part for private entities engaged in the business of transporting people which provide demand responsive service."  *UBER provides "demand responsive service,"* because similar to both a charter-party or a taxi ride, *the hire of an UBER vehicle requires a passenger to take the initiative* by making a call, sending an email, faxing a request, or *by making a Web-based reservation to schedule a ride.*

UBER claims that it is not a taxicab company, and the CPUC purports to join in that conclusion.  Thus UBER would not enjoy the same exemption from compliance with the ADA's transportation laws afforded authentic taxis in certain circumstances under

Section 37.29(b.)  Instead, because UBER (even if not technically a taxi company) orchestrates its drivers' performance of "taxi service," it is subject to ADA Section 37.29(c), which mandates that "(c) Private entities providing taxi service shall not discriminate against individuals with disabilities by actions including, ... refusing to provide service to individuals with disabilities...".  Yet UBER vehicles are for the most part not ADA-compliant, and likely some UBER drivers refuse to provide rides to individuals with disabilities, or who require assistance from for example a seeing-eye dog, every day (UBER now claims that it is amending its app to allow for reservations by blind passengers and other requiring assistance.)  Further, even the authentic taxicabs that might arguably be exempt from ADA-compliance, regularly include ADA-compliant vehicles in their fleets and have drivers who are specially trained in ADA access and assistance.  As noted, about eight percent of A TAXI's fleet is ADA-compliant, and a percentage of many if not all of the fleets of the taxi companies in the related case are also ADA-compliant; and many taxi franchises (including that of the City of Anaheim alleged above) require ADA-compliant taxis.  Many taxi fleets (including that of A TAXI) include a larger-than-required number of ADA-compliant vehicles in their fleet just because it is a good thing to do.

Public policy considerations clearly dictate that provision must be made for ADA passengers; industry estimates are that *about ten percent* of those needing "demand-responsive transportation" (i.e., those who would normally call or reserve a taxi) are in fact disabled.  Public policy dictates that TNCs, which are now usurping the business of authentic taxicabs, include ADA vehicles.  CPUC Decision 13-09-045 is unconstitutionally vague as it is silent on the important issue of whether a TNC is treated as a Charter Party or a taxi for the purposes of compliance with the ADA laws.

d) *Other Parts of CPUC Decision 13-09-045 that have not yet been worked out:*  The CPUC has treated and continues to treat its TNC Regulation as a sort of "work in progress."  On page 9 of the MODIFICATION, the CPUC states:

///

///

1            "As this is a new industry, the Commission knew that the rules and

2            regulations it enacted might need to be modified as real-time information

3            about TNC operations became known."

4 Further, the CPUC has continued to complete its TNC licensing regulations with

5 amendments, modifications, explanations, and "Phase II" proceedings.

6            In so doing, the CPUC has admitted that the TNC regulations were not

7 complete or accurate at the time that CPUC Decision 13-09-045 was drafted and later put

8 into operation, but rather were vague, ambiguous, and incomplete.  The Commissioners

9 indicated that they expected that the TNC regulations would have to be modified once they

10 learned what TNCs were really doing; what their "operations" really entailed, such that the

11 TNC regulations were enacted as a sort of "trial."  This is circular reasoning and the

12 definition of vagueness for new regulation.  When CPUC Decision 13-09-045 was put into

13 effect, the property rights of authentic taxi companies all over the state were violated and

14 authentic taxicab business severely curtailed.  As further alleged under the FIFTH and

15 SIXTH CLAIMS hereinbelow, because and in addition to the fact that the CPUC is making

16 up the rules as it goes along, it is also failing to enforce the TNC rules.  Instead, the CPUC

17 issues TNC permits to applicants that have not even submitted their entire written

18 applications that the CPUC indicates they must, in order to secure TNC permits.  The TNC

19 is failing to enforce UBER's violations of even the TNC rules, all to A TAXI's direct injury

20 as alleged herein.  Instead of pulling UBER's TNC license as it should based upon this non-

21 compliance, the CPUC has merely cited and fined UBER about its failure to comply with

22 the disclosure aspects of its regulations, while allowing it to continue to operate.  These

23 citations and fines are modest for UBER in the scheme of things and have not incentivized

24 UBER to comply with the rules; and UBER's non-compliance persists, with impunity to its

25 operations.

26            95.  In addition to being void for unconstitutional vagueness, CPUC

27 Decision 13-09-045 and its codification should be declared unconstitutional since they

28 ///

1   deprived A TAXI of its vested property rights without substantive due process simpliciter

2   and incorporated substantive due process rights, as follows.

3          96.   A TAXI and UBER are similarly-situated in that they compete directly

4   for the same taxi business of transporting private parties of eight or less persons including

5   the driver, for hire.  Under the *Fourteenth Amendment to the U.S. Constitution*, A TAXI is

6   entitled to the equal protection of the laws.

7          97.   By virtue of CPUC Decision 13-09-045 and the TNC Regulations, A

8   TAXI is being denied Equal Protection of the laws under the *Fourteenth Amendment*,

9   because OCTAP, the City of Anaheim, and the State of California require A TAXI to

10  operate as an authentic taxi company, subject to all of their regulations and at significant

11  time, effort, and expense, while UBER is allowed to offer virtually the same *de facto* taxi

12  service, without being subject to any of those regulations or expenses.  Further, while A

13  TAXI and the authentic taxi companies have to meet all of their application, licensing,

14  vehicle and driver inspections, and insurance requirements *prior to* the time that they are

15  allowed to place a vehicle on the road to pick up passengers, and their failure to do so

16  results in serious penalties and substantial costs, the CPUC has allowed and continues to

17  allow similarly-situated UBER to pick up fares *prior to* the time that it has completed its

18  TNC application, had its drivers' backgrounds checked, inspected its vehicles, or had proof

19  of its insurance on file.  Also, the CPUC continues to allow UBER to operate as a TNC

20  despite UBER's ongoing non-compliance with some of the terms of its TNC license, and

21  regardless of the filing of many complaints by consumers against UBER.  As a direct result

22  of A TAXI's denial of the Equal Protection of the laws guaranteed to it under Section 1 of

23  the *Fourteenth Amendment to the U.S. Constitution,* A TAXI has suffered all of the

24  damages and injuries alleged herein, and is in danger of going out of business.

25         98.   The acts and omissions of the CPUC, an entity authorized and existing

26  as a political subdivision of the State of California, as alleged herein, have also deprived A

27  TAXI of its property rights as guaranteed to it under Section 1 of the *Fourteenth*

28  *Amendment to the U.S. Constitution*, without due process of law as follows:

*e) Deprivation of Substantive Due Process Simpliciter:*

A TAXI maintains that in enacting CPUC Decision 13-09-045 the CPUC engaged in conduct that was arbitrary or conscious shocking in a constitutional sense, as the CPUC stepped outside of its authority and single-handedly passed and implemented a Decision that had the effect of destroying or severely curtailing the California taxicab business model that had been in effect for more than a century, and doing so in a manner that the authentic taxi companies affected could not challenge on a level playing field.

*f) Deprivation of Incorporated Substantive Due Process:*

In enacting and implementing CPUC Decision 13-09-045C, the CPUC violated A TAXI's substantive due process rights guaranteed to it under the *Fourteenth Amendment to the U.S. Constitution*, because the CPUC violated A TAXI's rights under the *Fifth Amendment to the U.S. Constitution* to not be deprived of its vested property rights without due process of law.

99.   This case presents an actual controversy within the jurisdiction of this Court.  A TAXI respectfully requests that this Honorable Court enter a Declaratory Judgment pursuant to 28 *U.S.C.* section 2201, declaring the rights and other legal relations of the  interested parties to this action with respect to the constitutionality of CPUC Decision 13-09-045, the ability of UBER to operate *de facto* taxicabs under the CPUC TNC Regulations, without complying with any of the regulations imposed upon and enforced against authentic taxi companies, and the constitutional violations visited upon A TAXI by the CPUC.  In particular but without limitation, A TAXI respectfully requests that this Honorable Court:

 1) Find and declare CPUC Decision 13-09-045 void as unconstitutionally vague, and declare it, the MODIFICATION, AB 2293, *Cal. Publ. Utils Code* sections 5430-5443,  and the TNC Regulations, void:

 2) Find and declare that UBER is operating as a *de facto* taxicab company, and that any and all further operations of UBER, its drivers, and UBER vehicles, be subject to local taxicab regulations, and in the County of Orange, this includes the OCTAP Regulations, the

1  Anaheim Taxi Franchise Ordinance, the JWA Taxi Franchise, and other Orange County

2  municipal taxi franchises; and

3  3)  Find and declare that the CPUC has violated the property and due process rights

4  guaranteed to A TAXI under the *Fifth and Fourteenth Amendments to the U.S.*

5  *Constitution.*

6

7  *SIXTH CLAIM FOR RELIEF, AGAINST THE CPUC,*

8  *MICHAEL PICKER, MIKE FLORIO, CATHERINE J.K. SANDOVAL,*

9  *CARLA J. PETERMAN, AND LIANE M. RANDOLPH,*

10  *FOR VIOLATION OF THE CIVIL RIGHTS STATUTES, 42 U.S.C. secs 1983 et seq.*

11  100.  A TAXI incorporates paragraphs 1 through 99, Inclusive of this

12  Complaint hereinto as though set forth at length.

13  101.  A TAXI is an "other person within the jurisdiction" of the State of

14  California within the meaning of 42 *U.S.C.* section 1983.

15  102.  The CPUC is a "person" within the meaning of 42 *U.S.C.* section 1983.

16  103.  In doing all of the acts and omissions alleged in this Complaint, the

17  Commissioners and the CPUC were acting under color of law within the meaning of 42

18  *U.S.C.* section 1983, because they purported to act under and pursuant to the enabling and

19  authority statutes of the *Constitution of the State of California* and the Code, in particular

20  but without limitation, the *Charter Party Act*, and were acting under color of the ordinances

21  and regulations enacted and put into effect by the CPUC and the State of California,

22  including but not limited to the CPUC procedural guidelines, the  TNC Regulations, CPUC

23  Decision 13-09-045, and its MODIFICATION.

24  104.  A TAXI presents this claim seeking legal redress against the

25  Commissioners and the CPUC in the form of damages, injunctive relief, and an award of

26  attorney's fees, because the acts and omissions described in this Complaint taken by the

27  Commissioners and the CPUC while they acted under color of law proximately caused or

28  were a substantial factor in causing A TAXI to be deprived of the rights guaranteed to A

TAXI under the *U.S. Constitution* and federal laws.  These acts and omissions included without limitation, the following:

a) *Denial of Equal Protection:*  A TAXI and UBER are similarly-situated in that they compete directly for the same taxi business of transporting private parties of eight or less persons including the driver, for hire.  Under the *Fourteenth Amendment to the U.S. Constitution*, A TAXI is entitled to the equal protection of the laws.  Yet as described above, by virtue CPUC Decision 13-09-045 and its codification, A TAXI is being denied Equal Protection of the laws under the *Fourteenth Amendment*, because OCTAP, the City of Anaheim, and the State of California require A TAXI to operate as an authentic taxi company, subject to all of their regulations and at significant time, effort, and expense, while as a direct result of the CPUC's enactment of CPUC Decision 13-09-045 and its creation and implementation of the TNC Regulations, UBER is allowed to offer virtually the same *de facto* taxi service, without being subject to any of those regulations or expenses.  As a direct result of A TAXI's denial of the Equal Protection of the laws guaranteed to it under Section 1 of the *Fourteenth Amendment to the U.S. Constitution,* A TAXI has suffered all of the damages and injuries alleged herein, and is in danger of going out of business.

b) *Denial of Due Process:*  The hereinabove-alleged acts and omissions of the CPUC have also deprived A TAXI of its property rights as guaranteed to it under Section 1 of the *Fourteenth Amendment to the U.S. Constitution*, without due process of law, all to A TAXI's damage and injury as alleged herein, as follows:

*i) Denial of Substantive Due Process Simpliciter:*

In enacting CPUC Decision 13-09-045 the CPUC engaged in conduct that was arbitrary or conscious shocking in a constitutional sense, creating and even encouraging UBER to unfairly compete for taxi business.  The CPUC stepped outside of and beyond its authority and single-handedly passed and implemented a Decision that had the effect of destroying or severely curtailing the California taxicab business model that had been in effect for more

///

than a century, and doing so in a manner that the authentic taxi companies affected could not fight on a level playing field, and without even giving the authentic taxi companies proper due process notice of the proceedings so that they could be adequately heard at them, all to A TAXI's damage and injury as alleged herein.

*ii) Denial of Incorporated Substantive Due Process:*

In enacting and implementing CPUC Decision 13-09-045, the CPUC violated A TAXI's substantive due process rights guaranteed to it under the *Fourteenth Amendment to the U.S. Constitution*, because the CPUC violated A TAXI's rights under the *Fifth Amendment to the U.S. Constitution* to not be deprived of its vested property rights without due process of law.  The CPUC did this by allowing and even encouraging UBER to unfairly compete with authentic taxi companies including A TAXI in the manner and to A TAXI's damage as alleged herein.

*iii)  Deprivation of A TAXI's Due Process Rights based upon TNC Regulation Vagueness:*  Constitutional Due Process guarantees include the right of a person to know and understand the laws, rules, regulations, and ordinances foisted upon that person by one acting under color of law, and to have reasonable notice and an opportunity to be heard, so that the person can either comply with that edict, or have a fair and reasonable opportunity to challenge that law, rule, regulation, or ordinance.  In the instant case, constitutional due process guarantees required that the CPUC clearly set forth and describe in the TNC regulations, exactly what a TNC is, and how it operates, in a manner that can be understood by a person of average intelligence.  In particular as to those persons including A TAXI who are likely to be impacted by the TNC regulations, due process guarantees require the CPUC to have clearly and comprehensively stated how authentic taxi companies including A TAXI would be impacted by the creation of a TNC, and to what possible extent.  Without limiting the generality of the foregoing, procedural due process in the creation of the TNC Regulations and their implementation, require that the CPUC have clearly stated whether it was purporting to create a new system of taxicab service in California, whether authentic taxi companies such as A TAXI could instead be

1   licensed as TNCs, whether A TAXI would no longer be required to comply with the
2   OCTAP Regulations, or the regulations governing the Anaheim Taxi Franchise Ordinance,
3   the JWA Taxi Franchise, and other municipal and state laws previously  governing the
4   operation of authentic taxicabs, what the exact insurance requirements were for TNCs and
5   their drivers, whether TNC vehicles (or a certain percentage of them) had to be ADA-
6   compliant, and all of the other related concerns raised throughout this Complaint.

7          c) *Enabling UBER's Violation of the Lanham Act and its acts of Unfair*
8   *Competition and Unfair Trade Practices:* As alleged throughout this Complaint, UBER
9   engaged in acts of unfair competition and unfair trade practices, directly competing with A
10  TAXI and operating a *de facto* taxicab service, but without complying with any taxicab
11  laws,  regulations, or restrictions.  As also alleged hereinabove, UBER made false or
12  misleading statements concerning the safety of its operations and its driver background
13  checks, and indicating that the operations of authentic taxicab companies such as A TAXI
14  were inferior, all of which directly harmed A TAXI in that they caused deceptions that
15  were material to A TAXI's passengers and potential passengers, and adversely affected the
16  purchasing decisions of A TAXI's existing or potential customers, all to A TAXI's
17  monetary and reputation damage.

18          By all of their acts and omissions taken under color of law as alleged herein,
19  in particular beginning when they enacted the TNC Regulation and allowed UBER to
20  operate a *de facto* taxicab company under a TNC license, and continuing thereafter with
21  their failure and refusal to enact transparent rules and regulations, and then to enforce them
22  against UBER, the Commissioners and the CPUC enabled UBER to violate the laws, and
23  because they were undertaken under color of law, A TAXI was helpless to halt UBER's
24  wrongful actions, all to A TAXI's damage as alleged herein.

25          105.  A TAXI lacks an adequate remedy at law to rectify the past, ongoing,
26  and future wrongful acts and omissions of the CPUC that have deprived and continue to
27  deprive A TAXI of its constitutional and civil rights, and if the CPUC is not enjoined from
28  continuing that deprivation, A TAXI will suffer irreparable harm and/or injury.

1  A TAXI seeks the issuance of temporary, preliminary, and permanent injunctive relief

2  against the CPUC and the Commissioners, restraining them from licensing or regulating,

3  purporting to license or regulate, and continuing to license or regulate, the conduct of TNCs

4  or taxicab business (whether authentic or *de facto*) in the State of California, which

5  licensing and regulation should instead be left to the local authority of cities and counties or

6  local agencies pursuant to *Cal. Govt. Code* section 53075.5.

7  106.  A TAXI seeks an award of attorney's fees and costs against the

8  Commissioners and the CPUC pursuant to 42 *U.S.C.* section 1988.

9

10  *PRAYER:*

11  WHEREFORE, A TAXI PRAYS that this Honorable Court enter Judgment

12  in its favor against UBER, the Commissioners, and the CPUC as follows:

13

14  *ON THE FIRST CLAIM FOR RELIEF:*

15  1.  For present and future damages for losses due to UBER's acts of unfair

16  competition, according to proof;

17  2.  For restitution of UBER receipts of A TAXI's vested property interest in

18  approximately 20% of UBER's receipts from its *de facto* taxicab operations in the City of

19  Anaheim;

20  3.  For temporary, preliminary, and permanent injunctive relief against

21  UBER pursuant to *Cal. Busn. & Prof. Code* section 17203;

22

23  *ON THE SECOND CLAIM FOR RELIEF:*

24  4.  For treble damages against UBER pursuant to *Cal. Busn. & Prof. Code*

25  section 17082;

26  5.  For temporary, preliminary, and permanent injunctive relief against

27  UBER pursuant to *Cal. Busn. & Prof. Code* section 17078, and that the requirement of a

28  bond be dispensed with under *Cal. Busn. & Prof. Code* section 17081;

6. For an award of attorney's fees and costs against UBER pursuant to *Cal. Busn. & Prof. Code* section 17083;

*ON THE THIRD CLAIM FOR RELIEF:*

7. For treble the amount of UBER's profits pursuant to statute, or whatever sum in excess of the actual damages the Court may deem appropriate, or A TAXI's actual damages against UBER;

8. For an award of A TAXI's marketplace damages against UBER;

9. For temporary, preliminary, and permanent injunctive relief against UBER pursuant to the *Lanham Act*;

10. For an award of attorney's fees and costs against UBER on the grounds that this is an exceptional case by virtue of the very egregious nature of UBER's misconduct;

*ON THE FOURTH CLAIM FOR RELIEF:*

11. For restitution of UBER receipts of A TAXI's vested property interest in approximately 20% of UBER's receipts from its *de facto* taxicab operations in the City of Anaheim, by which UBER was unjustly enriched to the detriment of A TAXI;

12. For temporary, preliminary, and permanent injunctive relief against UBER pursuant to *Cal. Busn. & Prof. Code* section 17203;

*ON THE FIFTH CLAIM FOR RELIEF:*

13. For the entry of a Declaratory Judgment against the CPUC pursuant to 28 *U.S.C.* section 2201, finding and declaring:

1) That CPUC Decision 13-09-045 is void as unconstitutionally vague, and declaring it, the MODIFICATION, AB 2293, *Cal. Publ. Utils. Code* sections 5430-5443, and the TNC Regulations, void:

///

2)  That UBER is operating as a *de facto* taxicab company, and that any and all further operations of UBER, its drivers, and UBER vehicles, are subject to local taxicab regulations, and in the County of Orange, this includes the OCTAP Regulations, the Anaheim Taxi Franchise Ordinance, and the JWA Taxi Franchise; and

3)  That the Commissioners and the CPUC violated the property and due process rights guaranteed to A TAXI under the *Fifth and Fourteenth Amendments to the U.S. Constitution.*

*ON THE SIXTH CLAIM FOR RELIEF:*

14.  For past and future damages against the Commissioners and the CPUC based upon their violation of A TAXI's rights under 42 *U.S.C.* section 1983;

15.  For temporary, preliminary, and permanent injunctive relief against the CPUC pursuant to 42 *U.S.C.* section 1983;

16.  For an award of attorney's fees pursuant to 42 *U.S.C.* Section 1988;

*ON ALL CLAIMS FOR RELIEF:*

17.  For pre-judgment and post-judgment interest at the maximum interest rate allowed on all amounts awarded;

18.  For costs of suit herein;

19.  For such other and further relief as this Court deems just and proper.


DATED: November 9, 2015                     *RESPECTFULLY SUBMITTED,*

                                            ***CAZZELL & ASSOCIATES, ATTORNEYS***



                                            /S/ Maryann Cazzell, Esq.


                            By: _____
                                            MARYANN CAZZELL, ESQ.
                                            ATTORNEYS FOR PLAINTIFF
                                            A WHITE AND YELLOW CAB, INC.

### DEMAND FOR A JURY TRIAL

Pursuant to *F.R.C.P.* 38(b), A TAXI demands a trial by jury of all Claims set forth in this Complaint that are subject to trial by jury.

DATED: November 9, 2015               *RESPECTFULLY SUBMITTED,*

                                      ***CAZZELL & ASSOCIATES, ATTORNEYS***


                                          /S/ Maryann Cazzell, Esq.


                                By: _____
                                      MARYANN CAZZELL, ESQ.