1  ***CAZZELL & ASSOCIATES, ATTORNEYS***
   ***MARYANN CAZZELL, ESQ.*** (Bar #128780)
2  406 W. Fourth Street
   Santa Ana, CA 92701
3  Telephone: 714/558-1772
   Facsimile:  714/558-1883
4  *cazzell@msn.com*

5  *Attorneys for Plaintiff/Responding Party*
   *A WHITE AND YELLOW CAB, INC.*

6

7

8                    *UNITED STATES DISTRICT COURT*

9      *NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION*

10

11 A White and Yellow Cab, Inc., a California          ) CASE NO.: 4:15-cv-05163-JSW
   corporation, dba A TAXI CAB, dba 1-800-             )
12 4 MY TAXI;                                          ) **AMENDED** MEMORANDUM OF
                                                       ) PLAINTIFF IN OPPOSITION TO
13                                                     ) MOTION OF THE **UBER**
                                                       ) DEFENDANTS TO DISMISS FIRST
14                                                     ) AMENDED COMPLAINT
                                                       )
15              *Plaintiff,*                           )
                                                       ) HEARING DATE: August 11, 2017
16 vs.                                                 ) TIME: 9:00 a.m.
                                                       ) COURTROOM: 5, 2d Floor
17                                                     ) JUDGE:  The Hon. JEFFREY S.
                                                       ) WHITE
18 Uber Technologies, Inc.; Rasier, LLC;               )
   Rasier-CA, LLC.; the California Public Utilities    )
19 Commission; Michael Picker, in his official         )
   capacity as Commissioner of the California          )
20 Public Utilities Commission; Clifford               ) CONTINUED
   Rechtschaffen, in his official capacity as          ) CASE MANAGEMENT CONF.:
21 Commissioner of the California Public Utilities      ) August 11, 2017
   Commission; Martha Guzman Aceves, in her            ) TIME: 11:00 a.m.
22 official capacity as Commissioner of the            ) COURTROOM: 5
   California Public Utilities Commission; Carla J.    )
23 Peterman, in her official capacity as               )
   Commissioner of the California Public Utilities      )
24 Commission; and Liane M. Randolph, in her           )
   official capacity as Commissioner of the            )
25 California Public Utilities Commission,             )
                                                       )
26                                                     ) COMPLAINT FILING DATE:
                                                       ) 11/10/15
27              *Defendants.*                           )
                                                       ) TRIAL DATE:  NONE
28 _____            )

A WHITE & YELLOW CAB  v. UBER #4:15-cv-05163-JSW       **OPPO** MEMO:  UBER MOTION TO DISMISS FAC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    On June 21, 2017 Cazzell & Associates, Attorneys, on behalf of Plaintiff A White and Yellow Cab, Inc. ("A TAXI,") inadvertently filed the "Plaintiff's Memorandum in Opposition to Motion of the UBER Defendants to Dismiss First Amended Complaint" (DOCKET #74,) which document was not the final version of the Memorandum.  Pursuant to *N.D. Cal. L.R. 10-1*, A TAXI hereby files this Amended Memorandum, which reproduces the correct and entire version of the Memorandum.  DOCKET #74 is not the correct version and should not be quoted, cited, or used.

*A.  SUMMARY OF ARGUMENT WITH REFERENCE TO IMPORTANT CASES CITED:*

A TAXI has followed the direction that the Court set out in its March 31, 2017 ORDER GRANTING, IN PART, AND DENYING, IN PART, MOTION TO DISMISS AND DENYING, AS MOOT, MOTION TO STRIKE (DOCKET #64) ("ORDER ON COMPLAINT") when it filed its FAC on April 26, 2017.  The FAC amended the viable claims for restitution under the "unfair" and "unlawful" arms of Unfair Competition Law ("UCL") and for damages under the Unfair Business Practices Act ("UPA"); (the claim for damages under the *Lanham Act* was not challenged.)  A TAXI specifically *removed* its claims for injunctive relief, its claims under False Advertising Law, and its claim for damages under the "fraud" arm of UCL.

This case differs in important ways from *Rosen v. Uber Technologies, Inc.*, 164 F.Supp.3d 1165 (2016) ("*Rosen II.*")  The FAC pertains only to "Phase I" of the CPUC's Rulemaking Proceedings, which found that UBER was *not a* "TNC," and A TAXI now seeks the dismissal of the CPUC; thus this case's findings will not "hinder or interfere with a broad and continuing CPUC program" under *Cal. Publ. Utils. Code* section 1759(a), especially the UPA claims.

A TAXI has alleged new facts that establish its entitlement to restitutions from UBER under UCL, as UBER stole A TAXI's lease dollars from its exclusive taxi contracts.  A TAXI had a "vested right" in the Anaheim taxi franchise under *Anaheim Municipal Code* ("*AMC*") section 4.73.040.   UBER has provided no authority that A TAXI's vested interest in taxicab lease payments derived from exclusivity contracts for "fares" cannot qualify as an ownership interest under *Colgan v. Leatherman Tool Group, Inc.* (2006), 135 Cal.App.4th 663.  Whether derived from a traditional taxi or a TNC vehicle, these are "quantifiable sums" that UBER owes A TAXI within the meaning of *Cortez v. Purolator Air Filtration Products Co.* (2000), 23 Cal.4th 163.

A TAXI has also adequately alleged a UPA claim based on UBER's selling of its services below its own costs for the (in the case of A TAXI's, consummated) intent of injuring competitors or destroying competition from authentic taxicab companies pursuant to *Cal. Busn. & Prof. Code* section 17043.   A TAXI chose not to pursue a claim of locality discrimination.  Since UBER has kept its operating costs secretive, A TAXI included the necessary allegations within the precedent of *G.H.I.I. v. MTS, Inc.* (1983), 147 Cal.App.3d 256, 275-276.

*TABLE OF CONTENTS*

*1. Introductory Statement*............................................................................................ 1

*2. A TAXI's UCL Claim does not run afoul of Cal. Publ. Utilities Code section 1759(a)*

*in that the third prong of the Covalt test is not satisfied under the facts alleged* ...................... 1

*A) This case differs factually and procedurally from Rosen II* ..................................... 2

*B) The FAC chiefly challenges the effects of "Phase I" of the CPUC Proceedings* ..... 3

*C) This Court has already found that the Phase I Decision is not an*

*"Order Affecting Rates." Thus the allowance of the FAC will not hinder*

*ongoing CPUC supervision and regulation of rates* .................................................... 5

*D) The FAC will not hinder ongoing CPUC supervision and regulation,*

*since A TAXI does not seek prospective injunctive relief* ............................................. 5

*E) The Phase I Decision specifically found that UBER was NOT a TNC,*

*such that the FAC could not "interfere with" ongoing CPUC Regulations* ................ 6

*F) A TAXI has Noticed the Dismissal of the CPUC from this case* ............................. 7

1   *3. The FAC properly sets forth a plausible claim of A TAXI's entitlement to restitution* .........  8

2

3       *A) A TAXI has alleged facts showing its vested right in particular sums of money*

4       *wrongfully taken from it by UBER through fares from venues observing*

5       *exclusivity contracts and franchises with A TAXI, under circumstances*

6       *in which passengers had no "ready choice" of which "taxi" to take* ........................  8

7

8           *1) The City of Anaheim taxicab franchise, good through at least 2022:* ..............  8

9

10          *2) Other exclusivity contracts and arrangements:* .............................................  10

11

12      *B) UBER has cited no authority that A TAXI's cab lease payments*

13      *cannot form the basis of a restitution claim* ...............................................  11

14

15      *C) Restitution is a broad concept that seeks to make the victim whole* ....................  12

16

17

18  *4. A TAXI has set forth a plausible claim for relief against UBER under the UPA* ................  12

19

20

21  *5. Conclusion, and request for leave to amend as to any claims that this Court*

22  *should deem to be insufficiently plead but potentially plausible* .................................  15

23

24

25

26

27

28

# TABLE OF AUTHORITIES

*FEDERAL STATUTES*

42 *U.S.C.* section 1342 (The *Johnson Act*) ........................................................................ 5


*STATE STATUTES*

*Cal. Busn. & Prof. Code* sections 17000 *et seq.* ("UPA") ..................................................... *passim*

*Cal. Busn. & Prof. Code* section 17024(2).................................................................... 15

*Cal. Busn. & Prof. Code* section 17029 ...................................................................... 14

*Cal. Busn. & Prof. Code* section 17040 ...................................................................... 12

*Cal. Busn. & Prof. Code* section 17043 ...................................................................... 13

*Cal. Busn. & Prof. Code* section 17044 ................................................................. 13, 14

*Cal. Busn. & Prof. Code* section 17047 ...................................................................... 14

*Cal. Busn. & Prof. Code* sections 17200 *et seq.* ("UCL") ..................................................... *passim*

*Cal. Busn. & Prof. Code* section 17203 ...................................................................... 12

*Cal. Publ. Utils. Code* section 1759 .......................................................................... 15

*Cal. Publ. Utils. Code* section 1759(a)................................................................... 1, 6, 7

*Cal. Publ. Utils. Code* section 2106 ......................................................................... 1, 15


*ANAHEIM MUNICIPAL CODE*

*AMC* 4.73.040 ............................................................................................. 9, 10


*FEDERAL RULES*

*F.R.A.P.* 32.1(a) ............................................................................................. 3

*F.R.C.P.* 41(a)(1)(A)(I) ...................................................................................... 7

1

*FEDERAL CASES*

2   *De Soto Cab Co., Inc. v. Picker,*196 F. Supp.3d 1107 (N.D. Cal. 2016) ............................ 3, 4, 5, 7

3   *Eastman v. Quest Diagnostics, Inc.*, 108 F. Supp.3d 827 (N.D. Cal. 2015) ................................ 12

4   *Goncharov v. Uber Technologies, Inc.*, SFSC Case #CGC-12-526017 ......................................... 3

5   *Kairy v. SuperShuttle International*, 660 F.3d 1146 (9th Cir. 2011) ..................................... 1, 6, 7

6   *L.A. Taxi Coop v. UBER*, 114 F. Supp.3d at 859 .......................................................... 10

7   *Rosen v. UBER Technologies, Inc.*, 114 F. Supp.3d 1165 *("Rosen II*) ...................................... 2, 7

8   *U.S. West, Inc. v. Nelson*, 146 Fed.3d 718 (9th Cir. 1998) ........................................................ 5

9

10

*STATE CASES*

11   *Bank of the West v. Superior Court* (1992), 2 Cal.4th 1254 .......................................... 3

12   *Cellular Plus, Inc. v. Superior Court* (1993), 14 Cal.App.4th 1224 .............................. 7

13   *Colgan v. Leatherman Tool Group, Inc.* (2006), 135 Cal.App.4th 163 ...................................... 11

14   *Cortez v. Purolator Air Filtration Products Co.* (2000), 23 Cal.4th 163 ............................... 11, 12

15   *G.H.I.I. v. MTS, Inc.* (1983), 147 Cal.App.3d 256................................................. 12, 13

16   *Hartwell Corp. v. Superior Court* (2002), 27 Cal.4th 256 .......................................... 6

17   *Hladek v. City of Merced* (1977), 69 Cal.App.3d 585 ................................................. 15

18   *Independent Journal Newspapers v. United Western Newspapers, Inc.* (1971),

19   15 Cal.App.3d 583 ................................................................................... 13

20   *Korea Supply Co. v. Lockheed Martin Co.* (2003), 29 Cal.4th 1134 ............................... 9, 10, 12

21   *San Diego Gas & Elec. Co. v. Superior Court (Covalt)* (1996), 13 Cal.4th 893 ..................... 1, 14

22   *Stepak v. American Tel. & Tel. Co.* (1986), 186 Cal.APp.3d 633 ......................................... 14, 15

23

24

25

26

27

28

*MEMORANDUM*

*1. Introductory Statement.*

Following the Court's issuance of its ORDER ON COMPLAINT, A TAXI reworked its first-draft Complaint and submitted its FAC addressing all of the points raised by the Court.  What emerges is a pleading that states plausible claims for non-injunctive relief against UBER under UCL and the UPA.[1]

*2. A TAXI's UCL claim does not run afoul of Cal. Publ. Utils. Code Code section 1759(a) in that the third prong of the Covalt[2] test is not satisfied under the facts alleged.*

*Covalt* is well-recognized for its creation of a three-part test to resolve the inherent conflict and tension between the application of *Cal. Publ. Utils Code* section 1759(a) (which strips courts of jurisdiction over CPUC matters) and section 2106 (which provides jurisdiction for an action for damages caused by a public utility's unlawful act.)

The court already determined that the first two prongs of the *Covalt* test - (1)  that the CPUC had the authority to adopt a regulatory policy on the subject matter of the litigation; and (2)  that the CPUC had exercised that authority - were met in this case (ORDER ON COMPLAINT, 9:12-24 and fn.11.)  As the Court noted, the question in this case is whether the adjudication of the UCL claims set forth in the FAC will "hinder or interfere with a broad and continuing CPUC program" within the meaning of *Covalt* and *Kairy v. SuperShuttle, Intern.*, 660 Fed.3d 1146 (9th Cir. 2011) ("*Kairy.*")  In finding that the third prong had been met, the Court opined that the "gravamen" of A TAXI's UCL claims in its first-draft Complaint were similar to those in *Rosen II* (ORDER ON COMPLAINT 10:23 - 11:3) *Covalt* will not bar A TAXI's UCL claims in the FAC for at least six reasons, enumerated below:

---

[1]     UBER misread the caption of the ORDER ON COMPLAINT, which read "ORDER GRANTING, IN PART, AND DENYING, IN PART, MOTION TO DISMISS,..." as instead reading "ORDER GRANTING, IN PART, AND GRANTING, IN ALL OTHER PARTS, MOTION TO DISMISS...".  But the ORDER ON COMPLAINT did not say that and the Court did not intend that.  Instead the Court granted leave to amend; and where it was able to in good faith do so, A TAXI took advantage of this opportunity.

[2] *San Diego Gas & Electric Co. v. Superior Court (Covalt)* (1996), 13 Cal.4th 893.

*A) This case differs factually and procedurally from Rosen II.*

The allegations of the FAC differ substantially from those of the first-draft Complaint, and the circumstances have also changed now that A TAXI seeks to dismiss the CPUC from the case. UBER's attempts to "make hay" of the Court's *March 2017* comparison of statements from the *Rosen II* Opinion to the allegations of the *first-draft Complaint filed in April 2017*, are ineffectual.

 The cases are factually dissimilar.  The plaintiff in *Rosen II* was a taxi driver - the owner of a taxicab medallion - who sought to bring a class action against UBER, in relevant part based on its *failure to comply* with the CPUC Regulations "for taxi and other transportation companies." 164 F.Supp3d.1165.  A TAXI was a traditional taxicab company that was driven out of business by UBER's acts of unfair competition and unfair business practices, that does not seek such relief.

Citing to page1174 of the *Rosen II* Opinion, this Court noted that the "crux of [plaintiff's] CPUC-based claims appears to be his allegation that, until Uber's subsidiary was issued a permit..., Uber was unregulated and operating illegally in ... California." ... (internal quotations and citations omitted.)  The *Rosen II* court found the allegations in the complaint showed *the CPUC had evaluated services like Uber and had finalized regulations to govern those services.  Id* at 1174-75."  ORDER ON COMPLAINT 10:1-5 (emphasis added.)

This Court went on to identify an important distinction between *Rosen II* and the instant case.  "Plaintiff does not allege the Uber Defendants should not be subject to those regulations at all, which distinguishes the facts here from the facts alleged in *Rosen II*."  ORDER ON COMPLAINT, 10:15-17.  True.  In *Rosen II* the gist of the CPUC-based allegations was that UBER failed to comply with the regulations *set up by the CPUC*; the gist of A TAXI's allegations pertaining to the CPUC here is that UBER did not qualify as either a charter-party carrier or a TNC, such that it should have, and should have been required to, comply with regulations for *taxicabs*, not TNCs [ORDER ON COMPLAINT, 10: 17-21;] this is the reverse of *Rosen II's* allegations.  This Court correctly recited that in A TAXI's view, the "ultimate issue" was whether or not UBER as operating "*de facto*" taxicabs [ORDER ON COMPLAINT, 10:19-11:1.]

But a central distinction between the cases is *temporal*: A TAXI stopped operating on April 4, 2016.  A TAXI's FAC seeks restitution under UCL based upon the CPUC's enabling of

1  UBER's acts and omissions *prior to that time.* The CPUC's Order Instituting Rulemaking was

2  issued in December 2012; as noted in the following Section the FAC chiefly addresses the

3  September 2013 CPUC Decision 13-09-045 (with some references to the November 2014

4  Modification Opinion (FAC, 16:1-19.)

5      The Hon. Judge Tigar had also found the issues in *Rosen II* sufficiently *dissimilar* from

6  those in this case so as to deny A TAXI's Administrative Motion for an Order deeming that case

7  "related" to the instant one (*Please see* EX. "G" to A TAXI's REQUEST FOR JUDICIAL

8  NOTICE in support of its Opposition to UBER's Motion to Dismiss the first-draft Complaint

9  ("RJN") - the ORDER Denying A TAXI's Administrative Motion.  In fact, in *Rosen II* Judge Tigar

10 *distinguishes* cases in which a complaint challenges the validity of the CPUC Regulations

11 *themselves.*

12     For the same reason the instant matter is distinguishable from *Goncharov v. Uber*

13 *Technologies, Inc.* SFSC Case #CGC-12-526017 ("*Goncharov*") (which the Court had referenced

14 as providing some persuasive authority that the third prong of the *Covalt* test had been satisfied as

15 to the first-draft Complaint) (ORDER ON COMPLAINT, 10:10-14.)[3]  As noted hereinbelow, all

16 requests for injunctive relief have been excised from the FAC.

17

18         *B) The FAC chiefly challenges the effects of "Phase I" of the CPUC Proceedings.*

19     What is referred to as "CPUC Decision 13-09-045" in the FAC is otherwise known as the

20 "Phase I" decision (*DeSoto Cab Co., Inc. v. Picker*, 196 F.Supp.3d 1107 (N.D. 2016).) ORDER

21 DENYING DEFENDANTS' MOTION TO DISMISS, Docket #46, 3:20-22.  Phase I was limited

22 to "a decision adopting rules and regulations related to TNCs." *Id.*  The Phase I decision admitted

23 that "[T]his development in passenger transportation for compensation, referred to in this

24 proceeding as TNCs and associated with companies including UberX,..., does not fit neatly into

25 the conventional understandings of either taxis or limousines,...".  *Phase I Decision at 11-12.*

26

27         [3] Besides, *Goncharov* is only a Superior Court case.  Even state court *Opinions* from
courts of appeal or higher are not binding in non-diversity federal court cases, and *Goncharov* is
28 not even an "Opinion." *F.R.A.P.* 32.1(a) (which legitimizes citations to Federal Interlocutory
Orders entered in cases in Courts situate in the Ninth District only) does not apply to them.

The Phase I decision did not adjudicate anything.  Rather, it set certain rules and regulations for those companies determined to be TNCs (*De Soto Cab*.)  The UCL allegations of the FAC referenced CPUC Decision 13-09-045, and mentioned the "November 2014 Modification Opinion," with a passing reference to "Legislative Bill AB2293" (FAC para. 41 (16:6-23)) (references to CPUC Decision 13-09-045 are throughout.)  The "FACTUAL ALLEGATIONS" pertaining to further damage by future rulings of the CPUC have effectively been rendered moot by A TAXI's inability to seek injunctive relief, since it went out of business.  The CPUC admitted that "White and Yellow does not raise a direct challenge to the Phase II Decision."  CPUC DEFENDANTS' REPLY ON THE JOHNSON ACT (DOCKET 60) ("CPUC REPLY,") 2:1-2.

The CPUC's "Phase II" decision was not issued until April 2016 (*DeSoto Cab* 4: 24-28.) Phase II was not an "Order Affecting Rates" in that it did not *set* rates for TNCs (possibly that will take place someday in the contemplated "Phase III"decision;) but it did direct TNCs to certify how their rates were calculated, and "addressed fare-splitting by TNCs" (*Loc. Cit.* at 4:28 - 5:6.)  But by then, A TAXI's doors were shuttered.

The gravamen of A TAXI's FAC claim challenging the propriety of the CPUC's statement that it was creating a new TNC class and was exercising jurisdiction over them was thus "flash frozen" *prior to the "Phase II" proceedings*.  As noted in sub-section (D) below, the CPUC had then not even determined whether UBER vehicles were TNCs or not.  After all, the CPUC was "just warming up."  Beginning its deliberations under a notion that *"someone has to do something,"* the CPUC conceded that "TNCs are a nascient industry" (p. 3); and made the circular statement that the CPUC would "also look for further guidance from the legislature should it decide that there is a need for legislation to provide guidance in regulating this new industry" (p.4).  In these Phase I proceedings the CPUC simply indicated that it was stepping in to "protect public safety" and "assess public safety risks"(*Id.*) by making sure that insurance was in place.

As noted in the subpart immediately following, the *DeSoto Cab* Opinion did some of A TAXI's work for it, by determining unequivocally that the "Phase I" Decision was not an "order affecting rates," such that A TAXI's ongoing challenge against UBER will not "unduly hinder ongoing CPUC supervision and regulation."

1
2
3

*C) This Court has already found that the Phase I Decision is not an "Order Affecting Rates."  Thus the allowance of the FAC will not hinder ongoing CPUC supervision and regulation of rates.*

4      This Court placed great reliance on the *DeSoto Cab* Opinion's rejection of the CPUC's
5  argument that Plaintiff's claims were barred by the *Johnson Act* (28 U.S.C. section 1342,) which
6  "withdraws state utility rate cases from federal jurisdiction when certain conditions are met."
7  (*DeSoto Cab at 7: 9-12*) (citing to *US West, Inc. v. Nelson* 146 Fed.3d 718, 721 (9th Cir. 1998).)
8  "As Flywheel contends here, it is not challenging an 'order affecting rates' as that phrase is used in
9  the *Johnson Act*." *DeSoto Cab,* 9:19-20.  "...But just because the Phase II decision is or may be an
10 order affecting rates does not mean that the Phase I decision is such an order.  Indeed, Phase I does
11 not have any direct bearing on rates at all." (*Loc. Cit., 10:1-3.)[4]*  Lest there remain any doubt, the
12 *DeSoto Cab* Opinion went on to clarify that the mere mention of the word "rates" did not
13 transform the introductory nature of the Phase I proceedings (*Loc. Cit.* at 10:4 - 13:24.)

14      In its January 25, 2017 ORDER REQUIRING SUPPLEMENTAL BRIEFING (DOCKET
15 #54) this Court referenced *DeSoto Cab's* rejection of the Claim that the Phase I Decision was an
16 "Order Affecting Rates" that would divest the Court of jurisdiction, asking the CPUC to submit
17 any contrary law.  The CPUC could not (CPUC REPLY, 3:4-6.)  Thus it is established in this case,
18 that at a minimum the FAC "will not hinder ongoing supervision and regulation" of TNC rates.

19

20
21

*D)  The FAC will not hinder ongoing CPUC supervision and regulation, since A TAXI does not seek prospective injunctive relief.*

22      As this Court and all parties to this litigation know well, A TAXI is out of business.  While
23 Defendants are correct that A TAXI would love to start up again, that is not going to happen
24 anytime soon, if at all.  Thus A TAXI lost standing and was forced to give up its injunctive relief
25 claims, and they have been removed from the FAC.  The "flip side" of this misfortune, however, is
26 that Defendants cannot now claim that the FAC will hinder "*ongoing*" acts or omissions at all.

27

28
_____
   [4] In Fn. 3 on p. 9, the *DeSoto Cab* court noted that it was not passing on whether or not
Phase II was sufficiently directed to rates as to fall under the *Johnson Act*, either.

1 A TAXI's FAC is reduced to claims for restitution and damages *based upon* the status of the

2 CPUC's *prior* and *consummated* rulings and decisions as of the time that A TAXI shut its doors on

3 April 4, 2016. This will not affect any "ongoing" actions.[5]  Certain damage actions (even though

4 arguably inconsistent with CPUC Decisions on the same subject matter) do not "interfere with the

5 PUC... if they simply seek redress for **past** violations." *Hartwell Corp. v. Superior Court* (2002),

6 27 Cal.4th 256, 262 (emphasis added.)

7

8    *E) The Phase I Decision specifically found that UBER was NOT a TNC, such that*

9    *the FAC could not "interfere with" ongoing CPUC Regulations.*

10    Paragraph 25 of the "**Findings of Fact**" portion of CPUC Decision 13-09-045 stated that

11    "...[T]he Commission finds that Uber (in contrast to UberX) is not a TNC."

12 The CPUC went on in paragraph 27 to announce that "...[T]he Commission would prefer to leave

13 all non-TNC issues, including Uber's potential TCP status, to Phase II." (*Accord* CPUC Decision

14 13-09-045 at p. 25.) Paragraph 7 of the "**DECISION MODIFYING DECISION 13-09-045**"

15 clarifies that the CPUC will not be considering whether "Uber Technologies itself" should be a

16 TCP until Phase II of the proceedings. *It also required* that "8. Only Uber X from the various

17 Uber Technologies offerings is permitted to provide Transportation Network Company services."

18 Thus UBER - at least in most of its name permeations - itself lacks standing to claim that the FAC

19 will "hinder" or "interfere with" the CPUC's ongoing (i.e. to Phase II and beyond) supervision and

20 regulations of *TNCs*:  the CPUC had already determined that those only applied to "UberX,"

21 (which is not a named defendant here.)

22    *Kairy* (*supra*), was another public livery case in which the defendant alleged the ban of *Cal.*

23 *Publ. Utils. Code* section 1759(a), and involved the question of whether drivers should be

24

25    [5]  A TAXI does wish to preserve its claims to any prospective damages (and if available,
restitution) against UBER based on A TAXI's prior track record of earnings.   To the extent that
26 A TAXI should prevail on some or all of what remains in the case, it is unlikely given A TAXI's
somewhat unique position in the overall UBER cases, that an advantageous holding would
27 provide binding precedent that could "hinder ongoing CPUC supervision and regulation."
Should this Court find that there is a probability that A TAXI could be awarded prospective
28 damages and that this might hinder ongoing CPUC authority, A TAXI would if necessary waive
the prospective claims in order to preserve its other claims against UBER.

classified as "independent contractors" or "employees."  The Ninth Circuit found at pp. 1146-57

that the third part of the *Covalt* test was *not* satisfied where the CPUC admitted that it "'has not

exercised authority over the ... employment classification of shuttle van drivers'"(other citation

omitted.)  Since the CPUC admitted that UBER was not a TNC, the only finding consistent with

*Kairy* in this case would be that the third part of the *Covalt* test was not met.


### F) A TAXI has Noticed the Dismissal of the CPUC from this case.

At or about the same time that the within Brief is being filed, A TAXI will be filing its

NOTICE OF DISMISSAL of the CPUC Defendants in this case pursuant to *F.R.C.P.*

41(a)(1)(A)(I).  To the extent that the FAC contained any allegations that would divest this  Court

of jurisdiction under *Cal. Publ. Utils. Code* section 1759(a), those allegations will be removed.

It should be clarified that the FAC did *not* allege that UBER should be subject to taxicab

regulations.  Rather, A TAXI alleged that UBER *unfairly competed* with A TAXI *because* UBER

did not comply with taxicab regulations.  This is a distinction with a difference.  A TAXI did not

seek a declaratory judgment saying that UBER should have to obey taxi laws (as did *Rosen II,*) nor

did A TAXI allege that the CPUC should allow it to operate its taxicabs under a TNC (as did

*DeSoto Cab*.)  A TAXI *does* allege that UBER's acts and omissions proximately caused it harm

and injury, for which it seeks damages and restitution.

Nor is the FAC (as UBER argues in its MOTION TO DISMISS, Docket #72 at 7:15 - 23) an

"Improper Collateral Attack On The CPUC's Decisions."  It is not an "improper collateral attack"

since the thrust of A TAXI's claim against UBER has always been UBER's *anti-competitive acts,*

rather than the CPUC Regulations allowing TNCs.

Analogous is *Cellular Plus, Inc. v. Superior Court* (1993), 14 Cal.App.4th 1224, 1243-46:

> We cannot conceive how a price fixing claim under the *Cartwright Act* could
> "hinder or frustrate" the PUC's supervisory or regulatory policies...  It is clear that
> the courts have primary, if not exclusive, jurisdiction over antitrust causes of
> action. (p. 1246.)  If we were to deny Cellular Plus a cause of action merely
> because the PUC had approved the prices as "reasonable" while ignorant of the
> alleged price fixing agreement, we would implicitly be encouraging regulated
> companies to engage in anticompetitive price fixing... (p. 1243.)

///

1  Now that the CPUC is being dismissed, there is no "attack" against the CPUC (whether "direct,"

2  "indirect," or something in between,) at all.  The CPUC's usurp of unauthorized *de facto*

3  taxicab operations never did give (or should have given) UBER a windfall "Get Out Of Jail Free"

4  card.  UBER can no longer hang on the coattails of the CPUC's immunities and jurisdictional

5  privileges.

6  *3.  The FAC properly sets forth a plausible claim of A TAXI's entitlement to restitution.*

7      The Court held in the ORDER ON COMPLAINT that A TAXI had adequately alleged

8  standing under both the "unfair" and the "unlawful" arms of UCL, if it could cure the other defects

9  noted in the first-draft Complaint (ORDER ON COMPLAINT, 16: 3 -10.)  Since the Court found

10  that A TAXI had sufficiently alleged injury-in-fact standing and causation, that left only amended

11  allegations showing that the third prong of the *Covalt* test was not met (which was established in

12  the Section above,) and A TAXI's allegations of a plausible claim to restitution, addressed below.

13

14      *A)  A TAXI has alleged facts showing its vested right in particular sums of money*

15      *wrongfully taken from it by UBER through fares from venues observing exclusivity*

16      *contracts and franchises with A TAXI, under circumstances in which passengers*

17      *had no "ready choice" of which "taxi" to take.*

18      The FAC set forth detailed allegations about several separate exclusivity agreements that A

19  TAXI enjoyed, deriving ongoing, regular, and non-speculative income from them through its

20  taxidrivers' lease payments, until UBER effectively took the contracts and the business (and A

21  TAXI's dollars) away.  These include:

22  1)  *The City of Anaheim taxicab franchise ("Anaheim franchise,") good through at least 2022:*

23      The "vested" nature of A TAXI's Anaheim franchise was judicially determined by

24  Administrative Law Judge ALAN R. BURNS in his September 2013 "DECISION OF THE

25  HEARING OFFICER" following a drawn-out trial (held within Orange County Superior Court

26  Case #30-2012-00579274, styled as "*A WHITE AND YELLOW CAB v. ANAHEIM, etc., et al.*")

27  (RJN EX. "E,") Judge Burns unequivocally found that "**[A] Taxi had a vested right to its**

28  **permit.**.. Under City's rules, franchises are granted for a term of ten (10) years...  A Taxi was

1   awarded a new franchise in 2012 for an additional ten-year term.  Pursuant to *AMC* Section

2   4.73.040 ..., it was awarded by ordinance adopted on August 21, 2012..." (emphasis added.)

3       Allegations about the Anaheim franchise were contained in the first-draft Complaint, but

4   they have been presented in more detail in paragraphs 52 - 55 of the FAC.[6]  These show that when

5   UBER usurped A TAXI's vested interest in this franchise through its acts of unlawful competition,

6   the money it took from A TAXI represented A TAXI's steady, reliable, *traceable* income.  Prior to

7   UBER's near-complete takeover of the business of authentic taxicabs, A TAXI could count on

8   $595 per week, per Anaheim-authorized cab, of which there were effectively 58 - and this number

9   continued until the bitter end of A TAXI's operating days - when A TAXI effectively had to

10  surrender its Anaheim franchise on April 4, 2016.  (FAC paras. 53 - 54.)[7]

11      These allegations differentiate this case from the allegations in the *L.A. Taxi* and *Rosen II*

12  cases that this Court found analogous under the then "current state" of the pleadings (ORDER ON

13  COMPLAINT, 18:1 - 6.)  A TAXI is not seeking non-restitutionary disgorgement as under the

14  case of *Korea Supply Co. v. Lockheed Martin Co.* (2003), 29 Cal.4th 1134, 1144-48.  As alleged in

15  the FAC, the demand for taxicab rides ("authentic" or *"de facto"*) are not "fungible" or elastically-

16  available as in an outputs-contract.  Instead, the City of Anaheim had done several professional

17  and costly studies to determine just how many full-time taxicabs were needed to fill the City's

18  needs - and that magic number was 165 (later growing to 230, and then 255 the number at which

19  that determined need has remained steady since 2009) - plus a 15% overage (FAC paras. 21-24.)

20  That is why the Anaheim Franchise limits franchise stickers to that number.

21      At ORDER ON COMPLAINT, 17:12 - 18:6 this Court noted that "[I]n *L.A. Taxi,* the

22  plaintiffs alleged they were harmed by Uber's conduct because 'customers [chose] to use Uber

23  rather than taking a taxi.'  *L.A. Taxi*, 114 F.Supp.3d at 859.  According to the plaintiffs, that caused

24

25      [6]  More allegations explaining A TAXI's twenty-nine year climb to its vested permit and
    franchise agreements in Anaheim are at FAC paras 19 - 24.  *See also RJN Exhibits B, C, & D.*

26      [7]  At fn. 15 of the ORDER ON COMPLAINT this Court stated that it expressed no
27  opinion on whether adding (to the FAC) the fact that A TAXI had to surrender its Anaheim
    franchise when it went out of business would be sufficient to state facts supporting a request for
    restitution.  A TAXI posits that the addition does indeed do so, especially when combined with
28  all of the additional allegations that present at least a plausible claim that UBER took away from
    A TAXI, the money it would otherwise have received from its Anaheim franchise operations.

1  them 'to lose significant revenue and suffer reputational injury.'  *Id.*  The court granted Uber's

2  motion to dismiss, because it concluded the plaintiffs failed to 'allege an ownership interest in any

3  of [Uber's] profits or a "confirmed" contractual relationship with any of Uber's customers.'  *Id.* at

4  867.  Lacking such allegations, the court found the plaintiff sought '"the type of non-restitutionary

5  disgorgement precluded under *Korea Supply.*"'  *Id.*"  *(additional citations omitted.)*  But while

6  that might have been true for the more generalized allegations in *L.A. Taxi*, it is not the case for A

7  TAXI.  Under the Anaheim franchise, at least in that City, there *was* no real "choice" for persons

8  looking for taxi rides there (unless by "choice," one means that a customer could "choose" among

9  A TAXI, YELLOW CAB, or CABCO to give him/her a ride - and even that "choice" was

10  sometimes taken away by OCTAP taxi "queueing" rules.)  With the 255 (plus 15%) franchises

11  available, the Anaheim taxi (authentic or *de facto*) market is "saturated" (FAC para. 55); (with the

12  exception of "peak" convention taxi demand periods, when the authentic taxicab franchisees are

13  each allowed up to 30 more franchise stickers to handle the overage (FAC para. 54).)  Simply

14  stated, there was no "room" for any Anaheim taxi ride contributions from UBER drivers, and

15  when they nonetheless operated in the City without holding an Anaheim franchise, they did so

16  unlawfully as in violation of *AMC* section 4.73.040, and every fare they took (or at least 20% of

17  them) they took right out of A TAXI's pocket.

18      *2) Other Exclusivity Contracts and Arrangements:*

19      A TAXI also added allegations to the FAC about its other exclusivity contracts, which

20  included the Santa Ana Train Depot, and several hotels and entertainment venues in the Greater

21  Newport Beach area.  A TAXI had secured the right to be the only taxi company allowed to pick

22  up fares at the Santa Ana Train Depot pursuant to a public bidding contract similar to the Anaheim

23  franchise, and initially paid the City of Santa Ana $6,000 per month for the privilege (FAC, 21:27

24  - 22:16.)  A TAXI also had exclusivity contracts or agreements with at least one of the restaurants

25  and clubs at the "Triangle Square" restaurant and shopping district in Costa Mesa, and 10-15

26  hotels in the Greater Newport Beach area; these were lucrative and provided relative income

27  security for A TAXI and its drivers (FAC, 22:16 - 24.)

28  ///

1   When and to the extent that an UBER driver snuck into the exclusive authentic A TAXI cab queue

2   to pick up a fare, in so doing, s/he literally stole the money out of A TAXI's pocket, because this

3   was money that A TAXI would have earned[8] (FAC, 24:15 - 20.)

4

5           *B)  UBER has cited no authority that A TAXI's cab lease payments cannot form*

6               *the basis of a restitution claim.*

7       *UBER* offered no authority that supports any argument that restitution laws require that the

8   fare money had to have been received in the same format (and if there had been any such

9   authority, UBER surely would have cited it.)  Indeed, it is not a matter of *comparing* the income

10  collected from UBER, with that taken from A TAXI (lease payments of between $500 and $595+

11  per cab, per week) (FAC, 20:11 - 21: 9.)  Instead, case law clarifies that it is the *plaintiff's damage*

12  which is calculated in making restitution awards. As explained in *Colgan* (*supra* at p. 667,)  "[T]he

13  Supreme Court has made clear that 'the object of restitution is to restore the status quo by

14  returning to the plaintiff funds in which he or she has an ownership interest'..." (this quote is *dicta*

15  only to the extent that it was found that the restitution award was error because there was

16  insubstantial evidence of the amount, to sustain it) (citing to *Korea Supply* at p. 1149.)   "Thus,

17  restitution awards encompass quantifiable sums one person owes to another" *(Cortez, supra, at p.*

18  *178.*)

19      The FAC carefully alleges the sums that A TAXI lost to UBER (or at least in material part to

20  UBER) per cab, on a weekly basis, and for which it seeks restitution.  UBER took $34,510 per

21  week from A TAXI in the form of the well-documented lease payments that A TAXI would have

22  received under the Anaheim franchise (FAC, 30: 1 -5.)  UBER also took up to $146,605 from A

23  TAXI in the form of lease payments that A TAXI otherwise would have received from its

24  exclusivity contracts and venues, plus additional lease losses for its prior operations elsewhere in

25  Orange County, for a total of up to $181,115 per week due in restitution (FAC, 30: 5 -13.)

26

27          [8]  The fact that the fare money went "through" an UBER account shared with its driver
    and UBER only retained a percentage of it, or in A TAXI's case, that the fare went "through" its
    authentic taxicab driver and was paid to A TAXI as a lease payment, is of no moment.  Had
28  UBER not stolen that fare, the earmarked fare money would have made its way to A TAXI
    instead.

1

*C.  Restitution is a broad concept that seeks to make the victim whole:*

2  "'[R]estitution is broad enough to allow a plaintiff to recover money or property in which he

3  or she has a vested interest.' (*Korea Supply at p. 1149.*)  *Busn. & Prof. Code* section 17203

4  encourages a court to '...make such orders .... as may be necessary to restore ... money or

5  property...' and the court's discretion is 'extremely broad'."  *Cortez, supra, at pp. 179-180.*  The

6  FAC more than sets forth a plausible claim as to A TAXI's loss of lease payments in which it had

7  a "vested interest," to UBER, as a result of its acts of unfair competition.

8

9  *4.  A TAXI has set forth a plausible claim for relief against UBER under the UPA.*

10  This Court found that the first-draft Complaint had not set forth a UPA claim under *Cal.*

11  *Busn. & Prof. Code* sections 17040 and 17043 because the allegations on these points were

12  conclusory and no facts were alleged to support claims for either locality-based discrimination[9] or

13  below-costs sales (ORDER ON COMPLAINT, 18:12 - 19:14.)  As to the latter claim, the Court

14  indicated that it might be sufficient for some of the allegations to be made "on information and

15  belief, based upon [their] experience..." under circumstances similar to those set forth in *G.H.I.I. v.*

16  *MTS, Inc.* (1983), 147 Cal.App.3d 256 (ORDER ON COMPLAINT, 19: 5 -14.)[10]  A TAXI has

17  substantially re-worked the first-draft Complaint and cured the deficiencies noted.

18  Roughly speaking the *G.H.I.I.* plaintiff was "Gramaphone," which had brought an antitrust

19  action against Tower Records and related companies for (in relevant part here) "sales below costs"

20  (p. 274.)  Citing to the traditional requirements to state a cause of action under Section 17043:  "a

21  sale of a product at less than cost, for the purpose or intent of injuring competitors or eliminating

22  competition" (citations omitted), the *G.H.I.I.* court found that it had stated a cause of action despite

23  having failed to allege a "definite cost of doing business" but had instead made those assertions on

24  ─────────────────────

25  [9]  A TAXI does not pursue a locality-discrimination claim in its FAC.

26  [10]  This Court also made reference here to *Eastman v. Quest Diagnostics*, *Inc.*, 108
F.Supp.3d 827, 838 (N.D. Cal. 2015), in which in relevant part a Motion to Dismiss was granted

27  with leave to amend where the plaintiff had neither alleged Quest's costs and prices, nor an
excuse from alleging them.  That matter is otherwise distinguishable because the plaintiffs in

28  *Eastman* were "consumers" and not "competitors" (as is A TAXI), and the plaintiffs had not
plead actionable injury (since as consumers they actually benefitted from Quest's underpricing.)
(*Id.*)

information and belief (p. 275.)  The court of appeal reversed and remanded that cause of action (along with many others) that had been dismissed following the sustaining of a demurrer without leave to amend (pp. 256 & 280.)  The court of appeal found a viable UPA cause of action even without detailed costs allegations (p. 275.)

The *G.H.I.I.* court reasoned:

> But we think that ... appellants are in a demonstrably poorer position than were the plaintiffs in Independent[11] ..., to speculate on a "supposed" cost figure, and that it would serve no useful purpose to require a speculative allegation of cost which adds nothing to the notice given by the pleadings in their present state. Accordingly we find the present pleadings as sufficient under section 17043....

A TAXI too is in a "poor position" to recite UBER's actual "costs," given UBER's well-known tendency to guard its price "algorithm" as a "trade secret" and to play its technological developments and its "app"-cards "close to its chest." Discovery has not yet commenced and the FAC was drafted without the benefit of it.  As *Independent* explained at p. 586:

> Without discovery (cit. om.) plaintiff could not be expected to know exactly what was defendants' cost of advertising space sold in defendants' weekly newspapers for the price of one insertion...  But, according to plaintiff's first amended complaint, it published several weekly newspapers and through its own cost experience it could have alleged on information and belief a supposed cost figure... it could easily have obtained the rate ..., and then have pled, ..., that defendants' sale of advertising space ... was a sale below cost and therefore possibly a violation of both section 17043 and 17044.

Even without discovery, A TAXI has alleged facts that support its "sales below costs" claim.[12]

---

[11]   Referring to *Independent Journal Newspapers v. United Western Newspapers, Inc.* (1971), 15 Cal.App.3d 583. All that was at issue in this case was whether it had been properly dismissed when the plaintiff failed to file the authorized amended complaint with the necessary UPA allegations, following the sustaining of a demurrer (pp. 584-85,) and the answer was "yes." Independent's _dicta_ comments about why discovery would have been useful are helpful here.

[12]   UBER argues that A TAXI has it "backwards" in that the FAC contains some allegations that UBER operated at costs *lower than* A TAXI.  Those allegations pertain to both the UCL and the UPA claims, and are tenable and not inconsistent.  As to the UCL claim, A TAXI alleges that UBER unfairly competed with A TAXI because the latter had to pay so much more of its *assets or receivables* in expenses: it is true that UBER unfairly competed with A TAXI because it did not pay the hefty licensing, regulatory, insurance, and vehicle maintenance expenses associated with the operations of traditional taxicabs (FAC, 25: 19 - 27:4.)  These are regular "operational" costs, and A TAXI was at a distinct disadvantage to UBER on this arena because A TAXI was for the most part helpless to do anything to lessen these costs:  it did not have a treasure trove of private investor money to blow and it could not compete. *Notwithstanding this,* A TAXI pled a plausible claim that UBER violated the UPA because it "overspent" so monumentally that its costs of operations exceeded its prices (FAC, 32: 8 - 19.)

1       A TAXI's UPA allegations of *price* are contained in paragraph 67 (DOCKET #65, 31: 20 -

2  32: 2.)  These state that UBER is allowed to retain 25% of its drivers' "base fare."  Base fares vary

3  depending upon the type of UBER vehicle selected - "...(from 'UBER X,' the 'no-frills' basic ride,

4  to UBER SUV, a large vehicle that can seat six.)  Prices to the consumer range from a base fare of

5  90 cents a mile, 15 cents per minute and a service fee of $2.30 for an UBER X ride, to $4.30 per

6  mile, 50 cents per minute, and a $15 base fee for an UBER SUV fee."  *Id.*

7       A TAXI'S UPA allegations of *cost* are contained in FAC para. 69 (32: 20 - 35:14.)  They are

8  of necessity general statements of overhead and operational costs, acceptable under *Cal. Busn. &*

9  *Prof. Code* section 17029 which includes "all costs of doing business incurred in the conduct of

10  the business."  A sampling of these FAC allegations include, that as of 2016 UBER employed

11  nearly 7,000 people (32: 25 - 26); and that it has substantial office, corporate compliance, software

12  development and maintenance costs; and insurance, promotional, advertising, and many

13  professional fees (33:1-12.)  Without limiting the generality of that, UBER has large legal fees and

14  settlement payments (34: 5-17); and large expenditures in its efforts to "avoid the law" (34:18 -

15  24.)  The FAC also alleges that UBER violated *Cal. Busn. & Prof. Code* section 17044 by its use

16  of "loss leaders" or by giving away services (35: 19 - 22), and Section 17047 by using internet and

17  cell phone advertising to solicit drivers to violate the UPA (36: 4 -7.)  Finally, A TAXI alleges that

18  in the absence of proof of its cost of doing business, UBER has violated the UPA because its

19  "distribution costs" were less than its invoice cost plus six percent (36:1 - 3.)

20       But the clencher is that UBER has all but admitted that it was losing money, since "**its**

21  **investors want to keep grabbing market share and not worry about generating profits.**

22  **Those can come later**" (35: 3 - 4) (emphasis added.)  UBER's flippant boast that its profits will

23  "come later" (35: 4) means, after all of the A TAXIs of the world have gone out of business.

24       UBER's "in-your-face" scofflaw defiance of the UPA provides further justification for

25  denying a *Covalt* exemption to this Court's jurisdiction.  No matter how "broad" or "continuing"

26  any jurisdiction of the CPUC might be, UBER's acts represent independent violations that go far

27  afield from any proper regulatory policy.  Instead, this falls within the carve-out to CPUC

28  preemption as adjudicated in *Stepak v. American Tel. & Tel. Co.* (1986), 186 Cal.App.3d 633.

1       *Stepak* was an action brought by minority shareholders of a public utility against another

2   utility alleging in relevant part unfair dealing in connection with a merger.  The Court of Appeal

3   found that *Cal. Publ. Utils. Code* section 2106, and not 1759, should have been applied,

4   announcing: "We are aware of no 'declared supervisory and regulatory policies' (cit. om.) ever

5   formulated or relied on by the commission on the subject of safeguarding minority investor

6   interests. ...[W]e cannot conceive of how the ... award of damages ... to wronged minority

7   shareholders would 'hinder or frustrate' (*ibid.*) declared commission policy."  *Stepak at p. 641.*

8   That is true here:  A TAXI was "wronged" by UBER's UPA violations, and compensation is due.[13]

9

10   *5.  Conclusion, and request for leave to amend as to any claims that this Court should deem to be*

11   *insufficiently plead but potentially plausible.*

12       On the basis of the foregoing, it is respectfully urged that this Honorable Court deny

13   UBER's Motion to Dismiss in its entirety, or grant leave to amend as to any insufficient

14   allegations.

15   DATED: June 21, 2017               *RESPECTFULLY SUBMITTED,*

16                                           *CAZZELL & ASSOCIATES, ATTORNEYS*

17                        /S/ Maryann Cazzell, Esq.

18                  By: _____

19                        MARYANN CAZZELL, ESQ.
                         ATTORNEYS FOR PLAINTIFF/RESPONDENT
                     A WHITE AND YELLOW CAB, INC.

20

21

22

23       [13] *Hladek v. City of Merced* (1977), 69 Cal.App.3d 585, cited by UBER, lends it no

24   support. It is easily distinguishable because its plaintiff, a taxicab company, sued a *city* under
UCL and the UPA, because the city was operating a competitive transportation service in the

25   nature of a "dial-a-bus, dial-a-ride" service. Here, A TAXI is suing the *competitor* directly.
That competitor happens *not* to be a "public utility," but rather, a private enterprise. *Hladek*

26   centers around whether the exemption to the applicability of the UPA set forth in *Cal. Busn. &
Prof. Code* section 17024(2) bars the plaintiff's claim. Only a public utility can potentially

27   advantage itself of that exemption, and UBER, a private entity, cannot. *Hladek* is otherwise
distinguishable since the plaintiff had failed to allege an "essential element" - "an intent by

28   respondent to injure competitors or destroy competition" (p. 591.)  A TAXI has alleged this at
FAC 35:15- 28.